**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HAWAIIAN FLOUR MILL, INC., Respondent.**

**No. 85–7411.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 24, 1986.

June 30, 1986.

---

Collis Suzanne Stocking, Washington, D.C., for petitioner.

Richard M. Rand, Torkildson, Katz, Jossem & Fonseca, Honolulu, Hawaii, for respondent.

Before FERGUSON, CANBY, and HALL, Circuit Judges.

FERGUSON, Circuit Judge:

The National Labor Relations Board (Board) seeks enforcement of its March 25, 1985 order requiring Hawaiian Flour Mills, Inc. ("HFM") to bargain collectively with the International Longshoremen's and Warehousemen's Union Local 142 ("Union"). The Board found that HFM had committed an unfair labor practice in violation of the National Labor Relations Act ("NLRA") §§ 8(a)(5) and (1), 29 U.S.C. § 158(a)(5) and (1). HFM contends that the Board improperly certified the Union because two supervisors' prounion conduct coerced the employees, thus denying them their freedom of choice in the election. We enforce the Board's order.

I.

Hawaiian Flour Mills manufactures and warehouses flour for commercial and retail bakeries, commercial kitchens, and restaurants in Honolulu. HFM is comprised of milling, warehousing, delivery, and packing divisions as well as export, quality control, and administrative departments. There are also support services in sales, purchasing, and maintenance. HFM has thirty-three hourly wage employees in Honolulu.

Until the 1981 election, the company was not unionized.

In June 1981, Gordon Pascal, superintendent of the HFM warehouse, telephoned Calvin Werner, a Union representative, and told him "we were interested in the Union." Pascal did not disclose HFM's identity. Werner told Pascal that he could not talk with Pascal because he was part of management. Two weeks later, Rudy Akina, an HFM employee, called the Union to begin an organization drive. Among the employees who handed out union authorization cards was Thom Reis, head miller at the plant. Reis handed out five authorization cards and signed one himself. The Union filed a petition on July 22, 1981, seeking certification as the exclusive bargaining unit representative at HFM.[1]

Both the Union and HFM campaigned for their respective positions. The company president, Lealand Blackburn, held management meetings to plan the company's antiunion campaign. Pascal participated in these, and assisted in carrying out the company's plans. The parties dispute whether Reis participated in any of the meetings. Until the week before the election, Reis actively supported the Union. After speaking with Blackburn, Reis changed his position, but he testified that some employees thought he remained prounion throughout the campaign.

The Board conducted a secret ballot election on September 10, 1981. Before the election, both parties stipulated that Pascal was a supervisor within the meaning of section 2(11) of the NLRA, 29 U.S.C. § 152(11). Pascal did not vote in the election. The parties did not determine Reis' status prior to the election. Reis voted in the election. Of thirty-three employees, seventeen voted for and fourteen voted against the Union. Two ballots, including Reis', were challenged. Both sides agreed

that these ballots would not affect the outcome of the election.

On September 16, 1981, HFM filed a timely objection to the election, alleging that the Union engaged in improper conduct, destroying the "laboratory conditions" necessary for a free election. HFM alleged that Pascal's and Reis' supervisory prounion conduct interfered with the employees' free choice in the election.

After hearings in February, March, and June 1982, the hearing officer concluded that both Reis and Pascal were statutory supervisors during the campaign but that their activities were not coercive. He found that Pascal was a major supervisor, who supported the company's antiunion campaign by speaking at meetings, informing management of employees' positions on the union issue, and circulating an antiunion petition. He also found that Pascal asked several "employees their opinion about the union and may have stated he was in favor of a union."[2] Based on this evidence the hearing officer concluded "that Pascal did not sponsor or campaign on behalf of the union" during the critical period. The hearing officer found that Reis was a "minor" supervisor who actively campaigned for the Union until a week before the election when he switched to an antiunion position. The hearing officer concluded that there was no "reasonable basis for believing" that Reis' or Pascal's conduct impaired the employees' freedom of choice.

HFM timely objected to the hearing officer's findings. In May 1984, the Board adopted the hearing officer's findings but clarified Reis' status as a supervisor. The Board certified the Union as the exclusive agent of the bargaining unit employees.

In October 1984, when HFM refused to bargain, the Union filed unfair labor practice charges with the Board's General

---

**1.** The proposed unit was composed of "[a]ll full-time and part-time warehouse, maintenance, utility and sanitation employees, packers, drivers, and millers of the Employer ...; excluding employees, guards and watchpersons as defined in the Act."

**2.** He did not credit the testimony of two employees, Williams and Tautillo, that Pascal forced one of them to sign a paper to bring in the Union and told the other that "the 'boys' wanted the union and asked him if he wanted to join, also, that the union may be a good thing."

Counsel. The General Counsel issued a complaint alleging that HFM refused to furnish requested information and refused to bargain, in violation of sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. § 158(a)(5) and (1). In January 1985, the General Counsel moved for summary judgment. The Board issued its decision and order on March 25, 1985, granting the General Counsel's motion for summary judgment. Finding "no merit to the Respondent's defenses based on improper certification of the Union," it held that HFM committed an unfair labor practice by refusing to bargain with the Union. HFM continued to refuse to bargain in order to obtain review of the Board's order by this court. *See NLRB v. Belcor, Inc.,* 652 F.2d 856, 858 (9th Cir. 1981).

## II.

A Board order must be enforced if the Board correctly applied the law and its findings of fact are supported by substantial evidence on the record viewed as a whole. *NLRB v. Island Film Processing Co.,* 784 F.2d 1446, 1450 (9th Cir.1986). The Board has broad discretion to establish safeguards and procedures necessary to conduct representative elections. *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330–31, 67 S.Ct. 324, 327–28, 91 L.Ed. 322 (1946); *Island Film,* 784 F.2d at 1450.

■ Supervisory participation in a union campaign will not per se invalidate an election. *Wright Memorial Hospital v. NLRB,* 771 F.2d 400, 404 (8th Cir.1985). However, supervisory support for a union organizing campaign will invalidate the union's victory when it " 'reasonably tend[s]' to have a coercive effect on or [is] 'likely to impair' an employee's choice." *Island Film,* 784 F.2d at 1451 (quoting *ITT Lighting Fixtures v. NLRB,* 658 F.2d 934, 937 (1981), *appeal after remand,* 712 F.2d 40 (2d Cir.1983), *cert. denied,* 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 833 (1984)).

■ When "the supervisors' conduct create[s] an impression that the employer favor[s] the union" or when the "supervisors' conduct create[s] a fear of future retalia-

tion," an election must be invalidated. *Island Film,* 784 F.2d at 1452 (citation omitted). Fear of retaliation is created when a prounion supervisor's solicitation of employees " 'contain[s] the seeds of potential reprisal, punishment, or intimidation.' " *Id.* (quoting *Global Marine Development, Inc. v. NLRB,* 528 F.2d 92, 95 (9th Cir. 1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 83 (1976)). In determining whether the supervisor's conduct is impermissible solicitation, we consider both " 'the extent of the supervisor's authority and the extent of his pro-union activity.' " *Id.* at 1451 (quoting *ITT Lighting Fixtures v. NLRB,* 712 F.2d 40, 43–44 (2d Cir.1983), *cert. denied,* 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 833 (1984)). Evidence of actual threats are not required; implied threats of retaliation are sufficient. *Id.*

HFM argues that the Board's order should be overturned because the Board incorrectly applied the law when it labeled the supervisors major and minor. HFM does not claim that the employees thought the supervisors' conduct represented the employers' position, but rather that the conduct of Pascal and Reis reasonably tended to coerce employees into voting for the Union.

■ The Board adopted the hearing officer's report labeling Reis as a minor supervisor and Pascal as a major one. This typology is often used as shorthand to explain the extent of a supervisor's authority and, thus, his coercive ability. However, characterizing supervisors as major or minor has been subject to considerable criticism. *See Island Film,* 784 F.2d at 1451–52 (determination of effect of supervisor's conduct cannot be made by simply labeling a supervisor as major or minor) (citing *ITT Lighting Fixtures,* 712 F.2d at 43–44); *Turner's Express, Inc. v. NLRB,* 456 F.2d 289, 291 (4th Cir.1972) (such designations not supported by the law). *But see Butler-Johnson Corp. v. NLRB,* 608 F.2d 1303, 1306 (9th Cir.1979) (statements made by low-level supervisors "are more likely to express individual views and less likely to

influence employee's decisions than statements by high-level officials") (quotation omitted). Certainly the characterization of a supervisor as "minor" cannot save an election when that supervisor has the power to punish or reward, and acts so that the threat of exercising that power reasonably tends to coerce employees in their voting. *See Island Film*, 784 F.2d at 1452. On the other hand, we conclude that the Board's classification of a supervisor as "minor" does not invalidate the Board's decision upholding an election, so long as the Board properly focused on "the extent of the supervisor's authority and the extent of his pro-union activity" in making its findings of noncoercion, and so long as substantial evidence in the record supports the Board's findings. *ITT Lighting Fixtures*, 712 F.2d at 44. Here the Board carefully evaluated the actual extent of the authority of Pascal and Reis, as well as their conduct, in determining that neither acted in a manner likely to coerce employees in their vote.

■ The Board found that while Pascal had extensive supervisory authority, he did not engage in prounion conduct during the election period. HFM disputes the Board's findings and challenges the hearing officer's decision to discredit the testimony of Williams and Tautillo. The hearing officer's conclusions with regard to Pascal are supported by substantial evidence. There is no dispute that Pascal called Werner to discuss the Union, and that Pascal discussed the Union with at least two other employees, including Reis, before the election. While this conduct is relevant, *Id.* at 1452 n. 8, it is not sufficient, in and of itself, to invalidate the election.

■ HFM also urges us to find that Reis had "plenary authority within the mill" and that his prounion conduct had a coercive effect on employees. In support of its contention that Reis had extensive authority, HFM cites testimony that Reis effectively recommended hiring and terminating employees, that he transferred employees, and that he recommended pay increases within prearranged schedules. HFM also cites Reis' authority to issue written warn-

ings and to evaluate employees at the end of their probation. HFM claims that training new millers was "almost exclusively the responsibility of Reis" and that his duties included scheduling fumigation, and supervising employees during it. Reis described himself as generally "ramrodding" the operation of the mill.

We conclude that the Board's findings regarding Reis' supervisory authority and noncoercive conduct are supported by substantial evidence on the record. While we might draw different conclusions from the testimony, "resolving conflicting interpretations of particular facts is not within the province of this court, for the inferences to be drawn from the evidence are matters for the Trial Examiner and the Board." *International Union, UAW v. NLRB*, 392 F.2d 801, 806 (D.C.Cir.1967), *cert. denied*, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968).

The Board found that Reis had limited supervisory authority. It considered not only Reis' power to punish but also to reward employees. *See Island Film*, 784 F.2d at 1451–52 (citation omitted). HFM did not uniformly follow his recommendations, he did not attend management meetings or participate in management group decisionmaking, he punched a time clock like other employees, and he received an hourly wage and the same fringe benefits as other nonsupervisory employees. The timing and amount of pay increases for miller trainees were fixed according to a predetermined schedule that Reis had no part in setting. Reis' supervisor, not Reis, approved vacations, overtime, and time cards. We agree that substantial evidence on the record supports the Board's finding that Reis had minimal authority over the employees.

■ Substantial evidence on the record also supports the Board's conclusion that Reis' prounion conduct was not coercive. Reis signed an authorization card and gave out five others. He testified that when he gave out the cards he told the employees to "sign them" and that one or two did. A supervisor's signing and giving out authori-

zation cards does not invalidate an election. *See Wright Memorial Hospital,* 771 F.2d at 405; *Global Marine,* 528 F.2d at 94–95. In context, Reis' statement to employees that they should sign the cards was not the kind of pressure that could reasonably tend to coerce employees in their freedom of choice. *See Wright Memorial Hospital,* 771 F.2d at 405; *cf. Turner's Express,* 456 F.2d at 292 (supervisors' persistent interrogations of employees about whether they intended to sign cards and warnings about the dangers of not signing, constituted coercion).

 Reis also talked with employees after softball games. In those discussions, Reis told employees why he favored the Union and what he thought it could do for them. He testified that he tried to convince "borderline" employees to vote for the Union. He denied acting as the Union's agent but, rather, described his statements as his "personal views." Reis also organized a meeting at the plant about a week before the election where he intended to discuss the pros and cons of the Union, but he admitted that during the meeting his statements favored the Union. Talking to employees about the union, expressing personal views about the union, and answering questions about the union are permissible expressions of opinion when made in noncoercive and nonthreatening circumstances. *Wright Memorial Hospital,* 771 F.2d at 405 (collecting cases); *cf. Turner's Express,* 456 F.2d at 292 (election invalidated when supervisors warned employees and threatened that they would "pay for it" if they didn't vote for the union). No evidence on the record supports the conclusion that Reis' activities were anything more than personal expressions of opinion about the Union. Furthermore, he was the only supervisor to engage in prounion activity during the election period. *Cf. Island Film,* 784 F.2d at 1453 & n. 9 (five supervisors engaged in almost continuous activity among twenty-five employees over whom they exerted significant influence). Reis' conduct does not invalidate the election.

### III.

We find Pascal's and Reis' activities insufficient to invalidate the bargaining unit election at HFM. While evidence of actual coercion is not required, we find insufficient evidence to support HFM's claim that employees could reasonably fear retaliation from Reis or Pascal so as to interfere with their freedom of choice. We enforce the Board's order.