**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CAL–WESTERN TRANSPORT, Respondent.**

**No. 87–7263.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1988.

Memorandum Filed Aug. 29, 1988.

Decided March 23, 1989.

Linda Dreeben, Victoria A. Higman, and Joseph A. Oertel, National Labor Relations Board, Washington, D.C., for petitioner.

Brian L. Rexon and Debby R. Hambleton, Rexon, Freedman, Klepetar & Thomas, Los Angeles, Cal., for respondent.

Before ALARCON, FERGUSON and BEEZER, Circuit Judges.

## ORDER

The memorandum disposition filed August 29, 1988, 857 F.2d 1478, is redesignated as an authored opinion by Judge Beezer.

BEEZER, Circuit Judge:

The National Labor Relations Board (Board) petitions for enforcement of its order finding that Cal–Western Transport Co. (Company) violated sections 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(1), (5), by refusing to bargain with the Building Material & Dump Truck Drivers Local 420, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union), which was certified as the collective bargaining unit of its employees. Because the Board did not abuse its discretion in upholding the representation election, we grant the Board's petition for enforcement.

## FACTS

The Company transports milk from dairies to creameries and calf ranches. On May 27, 1983, the Union filed a representa-

tion petition seeking certification as the collective bargaining unit of the Company's employees. The Board conducted a pre-election hearing to determine, *inter alia,* whether dispatcher Craig Kuyper was a supervisory, managerial, confidential, or office clerical employee within the meaning of section 2(11) of the Act, 29 U.S.C. § 152(11). The Regional Director determined, *inter alia,* that dispatcher Kuyper was not a confidential or office clerical employee, but that there was insufficient evidence to determine conclusively whether he was a supervisor or manager. He was thus permitted to vote subject to challenge. The Board denied the Company's request for review of the Regional Director's conclusions regarding Kuyper.

The Board conducted a secret ballot election on August 5, 1983. Of approximately 28 eligible voters, 26 total votes were cast. Of the 18 initially valid votes, 12 were for and 6 against the Union. The remaining eight ballots were challenged—sufficient in number to affect the results of the election.

The Company filed timely objections to the election, alleging that: (1) the Union improperly promised to reduce initiation and reinstatement fees during its organization drive; (2) the Union threatened employees with loss of their jobs; and (3) there was improper supervisory involvement in the Union's campaign. After an investigation of the challenged ballots and objections, the Acting Regional Director ordered a hearing. The Hearing Officer recommended overruling the Company's objections in their entirety and the challenge to one ballot, and sustaining the challenges to seven ballots, including Kuyper's ballot because he was a supervisor within the meaning of section 2(11) of the Act, 29 U.S.C. § 152(11). The Acting Regional Director adopted the Hearing Officer's findings and certified the Union as the exclusive collective-bargaining representative of the unit.

The Board subsequently granted the Company's request for review only as to its objection regarding the Union's alleged improper offers to waive initiation fees. The Regional Director vacated the Acting Regional Director's ruling on that objection and remanded the case to the Hearing Officer. The Hearing Officer recommended that the objection be overruled and that a Certification of Representative be issued. The Regional Director adopted the Hearing Officer's report, overruled the objection, and certified the Union. The Board denied the Company's request for review.

The Company refused to bargain with the Union, maintaining that the Board committed reversible error by overruling its election objections and certifying the Union. The Board's General Counsel issued a complaint alleging violation of sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1), (5).[1] On a motion for summary judgment, the Board ruled in favor of the General Counsel, concluding that the Company violated sections 8(a)(5) and (1) by refusing to bargain with the certified Union. The Board reasoned that all issues raised by the Company were or could have been litigated in a prior representation proceeding. Moreover, it explained that the Company had offered no newly discovered and previously unavailable evidence or special circumstances that would justify relitigation of the issues. After its sua sponte reconsideration of the case, the Board reaffirmed its decision on March 31, 1987.

## A. *Standard of Review*

 We conduct a limited review of the Board's underlying decision. *NLRB v. Island Film Processing Co.,* 784 F.2d 1446, 1450 (9th Cir.1986). The Board has broad discretion to determine the propriety of the union representation election process. *Micronesian Telecommunications Corp. v. NLRB,* 820 F.2d 1097, 1101 (9th Cir.1987); *Island Film,* 784 F.2d at 1450. As stated by the Supreme Court, "Congress has entrusted the Board with a wide degree of

---

1. These sections provide:
 (a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 . . . .
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946). We will not overturn a Board decision to certify a union unless it has abused its discretion. *Micronesian Telecommunications*, 820 F.2d at 1102. The Board's order must be enforced if it correctly applied the law and if its findings of fact are supported by substantial evidence on the record as a whole. *NLRB v. Hawaiian Flour Mill, Inc.*, 792 F.2d 1459, 1462 (9th Cir.1986); *Island Film*, 784 F.2d at 1450; *NLRB v. Best Prods. Co.*, 765 F.2d 903, 906 (9th Cir.1985).

### B. *Participation of Dispatcher Kuyper in the Election Campaign*

The Company argues that the Board erroneously held that its "supervisory taint" objection was properly overruled. The Company maintains that because dispatcher Kuyper was a supervisor, his participation in the election campaign had a reasonable tendency to coerce its employees. The Board reasoned that the dispatcher's limited campaign activity was neither coercive in itself, nor when viewed in the context of his limited authority to reward or retaliate against employees.

 Supervisory participation in a union campaign will not per se invalidate an election. *NLRB v. Yuba Natural Resources, Inc.*, 824 F.2d 706, 708 (9th Cir. 1987); *Hawaiian Flour Mill*, 792 F.2d at 1462. However, supervisory support will invalidate the Union's victory if its reasonably tends to have a coercive effect on or is likely to impair an employee's choice. *Yuba*, 824 F.2d at 708; *Hawaiian Flour Mill*, 792 F.2d at 1462; *Island Film*, 784 F.2d at 1451.

 As we have recognized, an election must be invalidated if the supervisor's conduct creates either an impression that the employer favors the Union or a fear of future retaliation. *Hawaiian Flour Mill*, 792 F.2d at 1462. The Company alleges that the latter has occurred. Such fear of retaliation occurs when a pro-union supervisor's solicitation of employees " 'contains the seeds of potential reprisal, punishment,

or intimidation.' " *Id.* (quoting *Island Film*, 784 F.2d at 1452); *see also Global Marine Dev., Inc. v. NLRB*, 528 F.2d 92, 95 (9th Cir.1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 83 (1976). In determining whether the supervisor's conduct is impermissible solicitation, we consider both the extent of the supervisor's authority and the extent of his pro-union activity. *Hawaiian Flour Mill*, 792 F.2d at 1462; *Island Film*, 784 F.2d at 1451.

The Company's challenge against Kuyper's ballot was sustained because of his supervisory status. Nonetheless, the Company maintains that because of dispatcher Kuyper's supervisory authority, his participation in campaign activities tended to coerce employees in deciding whether to select a bargaining representative. We review the record as a whole to determine whether Kuyper's conduct "laid the foundation for potential coercion of the employees." *Island Film*, 784 F.2d at 1452. If the Board properly focused on the extent of Kuyper's supervisory authority and his pro-union activity in making its findings of noncoercion, and if substantial evidence in the record supports its findings, we must uphold the Board's conclusion. *Hawaiian Flour Mill*, 792 F.2d at 1463.

As a dispatcher, the evidence on the record shows that Kuyper's primary responsibility is to establish, assign, and adjust the drivers' milk pick-up and delivery routes. These routes are designed by taking into account the milking times of the dairies, the delivery request by customers, and the amount of milk that could be transported on a given route. Once established, these routes rarely change during a season. Kuyper reports to the terminal manager and the Company's vice president, and works in the same office with them. He is paid $1.00 per hour less than the drivers he dispatches, but receives the same benefits. With the exception of the yardman, the dispatcher is the Company's lowest paid employee.

Kuyper and the terminal manager together pick a driver for each route, and determine the driver's schedule. Kuyper may adjust the routes to avoid overloading

trucks, and determines whether to hold a driver at a particular dairy if the dairy is behind in its milking schedule. Kuyper also reviews the drivers' worksheets and paysheets to correct inaccuracies or discrepancies. Kuyper testified that his power to discipline employees was minimal; he could issue verbal warnings that are not recorded in the employees' personnel files. Although he was told he had the power to issue written warnings, he has never exercised that power. He has no authority to hire, fire, or promote employees. Although his recommendations on hiring have occasionally been followed, the record indicates that employees have also recommended individuals who have been hired.

Kuyper attends supervisory meetings to review the profitability of routes, driver preference, and cost of supplies and vehicles. He prepares monthly profit and route analysis reports used by the Company to check revenue-to-labor ratio and to evaluate whether route changes can increase profits. He does not participate in employee evaluations or disciplinary interviews. He testified that with respect to employee performance, his role is basically to suggest modifications in the routes. His ability to grant time off and sick leave is fairly routine because various routes require no special skills and the drivers frequently fill in for one another.

Before the Union filed its representation petition, Kuyper met with the Union's business agent and solicited four authorization cards from other employees. He was instrumental in scheduling the first organizing meeting, and encouraged other employees to attend the first Union meeting. After the Union filed its petition, however, Kuyper limited his involvement to attending four or five organizing meetings, and consenting to the Union's identifying him as a member of its organizing committee. At one of the meetings, he expressed his feelings that "we need a union."

In determining whether Kuyper's conduct could reasonably tend to coerce employees, the Board thoroughly examined the degree of his supervisory authority, including his ability both to reward and retaliate, and the extent of pro-union conduct. The Board agreed with the Hearing Officer's conclusion that Kuyper's conduct did not interfere with the employee's free choice in the election.[2] The Board relied primarily on "his minimal supervisory power to either reward or adversely affect unit employees," as well as his limited pro-union conduct.

A fair review of Kuyper's supervisory authority demonstrates that substantial evidence supports the Board's conclusion. Kuyper's minimal supervisory power could not be easily manipulated in order to punish or reward employees. The record indicates that he exercised only a degree of independent judgment in assigning drivers to routes, largely because the routes are designed to accommodate factors outside of Kuyper's control, such as milking and delivery times specified by customers and

---

2. However, the Board made clear that it did *not* rely on the Hearing Officer's summary characterization of Kuyper as a "minor" supervisor. The Board observed that such a shorthand designation indicating the extent of an individual's supervisory power has met with considerable criticism by various circuits. *See, e.g., ITT Lighting Fixtures v. NLRB,* 712 F.2d 40, 43–44 (2d Cir.1983), *cert. denied,* 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 833 (1984); *Turner's Express, Inc. v. NLRB,* 456 F.2d 289, 291–92 (4th Cir.1972); *see also Hawaiian Flour Mill,* 792 F.2d at 1462–63; *Island Film,* 784 F.2d at 1451–52. This court's position has been that:

> Certainly the characterization of a supervisor as "minor" cannot save an election when that supervisor has power to punish or reward, and acts so that the threat of exercising that power reasonably tends to coerce employees in their voting. On the other hand, we con-

clude that the Board's classification of a supervisor as "minor" did not invalidate the Board's decision upholding an election, so long as the Board properly focused on "the extent of the supervisor's authority and the extent of his pro-union activity" in making its findings of noncoercion, and so long as substantial evidence in the record supports the Board's findings.

*Hawaiian Flour Mill,* 792 F.2d at 1463. In its final decision, the Board carefully evaluated the actual effect of Kuyper's authority, as well as his conduct, in determining that he did not act in a manner likely to coerce employees in their vote. Moreover, the Board overruled its previous decisions that could be "interpreted as suggesting that a major/minor characterization may be substituted for a complete analysis of the extent of supervisory authority."

truck capacity. Moreover, the determination of such assignments is made in conjunction with the terminal manager.[3]

Kuyper's ability to grant time off and sick leave are routine and limited, thereby affording him no substantial scope for reprisals. No evidence on the record shows that he has discretion to deny employees time off for any other reason than inability to find a substitute. No employee who is regularly scheduled to be off is ever compelled to come into work. As to vacations, the record does not demonstrate that Kuyper has the authority to disapprove a requested vacation for any reason other than another employee is already scheduled at the same time. Further, Kuyper's disciplinary and administrative authority is too minimal to create a situation where he could significantly reward or punish unit employees.

█ As to Kuyper's pro-union conduct, substantial evidence on the record supports the Board's conclusion that Kuyper's pro-union conduct was not coercive and that the Company's "supervisory taint" objection was properly overruled. Although Kuyper was involved with the initial organizing drive, there is no evidence that he engaged in any significant pro-union conduct after the petition had been filed. The Company has not alleged that Kuyper threatened employees in any way or promised any rewards. The mere fact that Kuyper solicited four authorization cards does not require the election to be overturned. As we have reasoned: "A supervisor's signing and giving out authorization cards does not invalidate an election." *Hawaiian Flour Mill*, 792 F.2d at 1463–64. In the circumstances of this case, Kuyper's solicitation before the Union's representation petition is not the kind of pressure that could reasonably tend to coerce employees in their freedoms of choice. *Cf. Turner's Express v. NLRB*, 456 F.2d 289, 292 (4th Cir.1972) (invalidating election where supervisors' persistent interrogations of employees about whether they intended to

sign cards and warnings about the dangers of not signing constituted coercion). Moreover, Kuyper's presence at organizing meetings or expression of his personal views in favor of the union did not impair the employees' freedom of choice. *Hawaiian Flour Mill*, 792 F.2d at 1464 (reasoning that a supervisor's "[t]alking to employees about the union, expressing personal views about the union, and answering questions about the union are permissible expressions of opinion when made in noncoercive and nonthreatening circumstances"); *cf. Turner's Express*, 456 F.2d at 292 (invalidating election when supervisor warned employees and threatened that they would "pay for it" if they did not vote for the union).

In light of his limited pro-union conduct and minimal supervisory authority, Kuyper's activities are insufficient to invalidate the bargaining unit election. Although evidence of actual coercion is not required, there is inadequate evidence to support the Company's claim that the employees could reasonably fear retaliation from Kuyper so as to interfere with their freedom of choice. Because the Board's analysis was proper and substantial evidence support its conclusion that Kuyper possessed only limited authority to reward or retaliate against employees, we uphold the Board's ruling on this issue.

### C. *Determination of Dispatcher Kuyper's Supervisory Status*

The Regional Director declined to decide Kuyper's status before the election, reasoning that "as the record is insufficient to determine conclusively whether Kuyper is either supervisory or managerial, I shall permit him to vote subject to challenge." The Company contends that the failure to determine Kuyper's status prejudiced the Company in the election.

█ The mere fact that Kuyper was allowed to vote subject to challenge does

---

**3.** The Company argues that Kuyper could retaliate against employees by not assigning them "specials," which are last minute calls for pickups. The evidence shows, however, that these runs are assigned to whoever is available, and that drivers were entitled to turn them down. Moreover, the drivers are not paid extra for overtime, and the record does not demonstrate that "specials" were sought after by the drivers.

not demonstrate that the election was impaired. *See NLRB v. Doctors' Hospital of Modesto,* 489 F.2d 772, 776 (9th Cir.1973). We have recognized that "[s]uch challenge procedures are part of a longstanding practice of the Board. The challenge procedures will not be disturbed except for an abuse of discretion." *Id.* (citing *NLRB v. Corral Sportswear Co.,* 383 F.2d 961, 965 (10th Cir.1967) (reasoning that "[t]he procedural method to be invoked by the Board to settle a dispute involving supervisory status is a matter falling within the field of administrative expertise and will not be disturbed by this court absent a clear absence of discretion")). Such attendant procedural discretion is a necessary part of the Board's "wide discretion in determining whether an individual is a supervisor." *Island Film,* 784 F.2d at 1450.

■ Given the sparse record before it, it was not an abuse of discretion for the Regional Director to allow Kuyper to vote subject to challenge. After both sides were allowed a full and complete opportunity to make oral argument, present evidence, and examine and cross-examine witnesses, a Hearing Officer concluded that Kuyper was a supervisor within the meaning of section 2(11) of the Act, 29 U.S.C. § 152(11).[4] The Company has adduced no concrete evidence of prejudice, other than a vague assertion that a prior determination could have had a significant effect upon the outcome of the election. Accordingly, we conclude that the Regional Director did not abuse its discretion in allowing Kuyper to vote subject to challenge.

D. *Promise to Waive Initiation and Reinstatement Fees*

■ The Company contends that the Union impermissibly promised to waive initiation and reinstatement fees only for employees who supported the Union before the election. In *NLRB v. Savair Mfg. Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), the Supreme Court held that a un-

ion's offer to waive initiation fees for all employees who sign authorization cards before an election interferes with the employees' rights to refrain from union activities and requires an election to be set aside. *Id.* at 275–81, 94 S.Ct. at 498–501. We have recognized, however, that *"Savair* made equally clear that unconditional offers to waive initiation fees for all employees, including those who became members after the election, are proper." *NLRB v. L.D. McFarland Co.,* 572 F.2d 256, 259 (9th Cir.), *cert. denied,* 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 257 (1978) (citing *Savair,* 414 U.S. at 274). As a result, union promises "to waive initiation fees are improper and require an election to be set aside *only* if they are conditioned upon a showing of pre-election support for the Union." *NLRB v. Aaron Bros. Corp.,* 563 F.2d 409, 412 (9th Cir.1977) (emphasis in original); *see also L.D. McFarland,* 572 F.2d at 259.

■ The credited evidence and testimony considered by the Hearing Officer supports the conclusion that the Union's "offer to waive initiation fees was not conditioned upon supporting the union in any manner, that they were waived for all employees until such time as the contract was signed, and that employees were unambiguously informed that fees were waived in a manner consistent with *Savair."* The credited testimony also supports the determination that the Union business agent's offer to have reinstatement fees waived "was unconnected with support for the Union before the election, unrelated to a vote in the election, and without distinction between joining the Union before or after the election." Testimony on this issue was in conflict, but the Hearing Officer was entitled to believe those witnesses who testified that the initiation and reinstatement fee waiver was not conditioned on pre-election support. *See In re Bel Air Chateau Hospital, Inc.,* 611 F.2d 1248, 1253 (9th Cir. 1979); *NLRB v. Mike Yurosek & Sons,*

---

**4.** Section 2(11) defines a "supervisor" as:

[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

*Inc.,* 597 F.2d 661, 663 (9th Cir.), *cert. denied,* 444 U.S. 839, 100 S.Ct. 78, 62 L.Ed. 2d 51 (1979). The Company attacks the Hearing Officer's credibility determinations and relies on contrary testimony discredited by the Hearing Officer.

The Hearing Officer's credibility determinations were based on a careful and detailed analyses of the testimony of all the relevant witnesses. We have recognized that:

> Because the Board hearing officer who observes the witnesses and hears their testimony is in the best position to judge witness credibility, such determinations are entitled to *great deference* and will not be disturbed unless a *clear preponderance* of all the relevant evidence convinces the court that they are incorrect.

*Bell Foundry v. NLRB,* 827 F.2d 1340, 1343 (9th Cir.1987) (emphasis added); *see also NLRB v. Pacific Int'l Rice Mills, Inc.,* 594 F.2d 1323, 1326 (9th Cir.), *cert. denied,* 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 134 (1979). In light of the "special weight" that this court gives to credibility determinations when conflicting evidence is presented, the Company's burden is indeed heavy to show by a clear preponderance that the Board was incorrect. The Company fails in satisfying its burden. In concluding that the Union did not violate *Savair,* the Hearing Officer was entitled to rely on witnesses he considered credible and disregard conflicting evidence that he did not consider credible. *In re Bel Air Chateau Hospital,* 611 F.2d at 1253. Such "[c]redibility determinations are within the special province of the Board and absent exceptional circumstances will not be overturned on review." *Id.* The Company has not shown extraordinary circumstances and has not demonstrated by a clear preponderance of all the relevant evidence to convince the court that the hearing officer's credibility determinations are incorrect.[5]

We thus refuse to disturb the Hearing Officer's credibility determinations and uphold the Board's conclusion that the Union did not improperly condition the initiation and reinstatement fee waiver on pre-election support for the Union.

**E.** *Alleged Union Threats of Termination*

According to the testimony of one employee, the Union business agent told the employees "that if they didn't vote for the Union, they would be fired." Yet, the employee testified that in the same meeting the Union business agent told employees that "once the Union was in, the Employer 'would have to have a good reason to fire us. It couldn't be for any small stuff.'" The Union business agent testified that he told employees that "the best thing the Union had to offer was job security." The Hearing Officer observed that "the subject of discharge came up within the context of discussions regarding a 'just cause' provision in a collective bargaining agreement, should the Union win the election." The Hearing Officer thus reasonably concluded that the Union business agent "was attempting to convince employees of the benefits of unionization, and his statements as such amounted to campaign propaganda."

The Company relies solely on the Board's decision in *Baja's Place, Inc.,* 268 NLRB 868 (1984), where the conduct of a union business agent warranted the setting aside of an election. *Id.* at 869. In *Baja's Place,* the union business agent, about ten days before the election, mailed letters informing unit employees of an upcoming union meeting. The notice was not sent to one employee who was thought to be involved in the discharge of an employee organizer.

---

**5.** The Company maintains that because the Hearing Officer's credibility determinations were issued seventeen months after the hearing, they should be rejected. A fair reading of the Hearing Officer's report, however, reflects that he was able to recollect sufficiently the demeanor of the witnesses. Mere passage of time, without more, does not refute that recollection. Moreover, the Hearing Officer supported his credibility assessments with a careful analysis of each witness's testimony, including the manner in which each witness responded to questioning. The Company, in essence, is asking us to make a different credibility determination based on a "cold" record after even more time has passed—thereby committing the same alleged error that the Company accuses the Board's Hearing Officer of making. We are reluctant to make such a different credibility determination.

Instead, the union business agent sent that employee a letter on the union's stationery that stated "f_____ you a___ _____." In a subsequent conversation, the union business agent threatened the employee that he "would get him" and that he "would get [the employee's] job." The Board concluded that the union business agent's threats were "clearly coercive and objectionable, as they can reasonably be interpreted as threats of economic retaliation, physical harm, and other unspecified reprisals." *Id.* at 868. Moreover, it was crucial to the Board's outcome that the union business agent "exercised a significant degree of influence over a substantial number of jobs in the industry and that [his] threats 'to get [the employee's] jobs' and "to get" [the employee] were not idle threats made in a vacuum, but were threats made by a union official who wielded substantial influence in the local industry." *Id.* at 868–69.

Such is not the case here. The Union business agent had no influence or authority to effect the predicted discharges. None of his campaign propaganda or predictions could be characterized as threats of physical or economic retaliation as in *Baja's Place.* The Union business agent's statements, although misleading, are not sufficiently threatening to justify the setting aside of the election.

■■■ As the Hearing Officer concluded, the Union business agent's campaign propaganda may have been misleading. Nonetheless, the Board has determined that it "will no longer probe into the truth or falsity of the parties' campaign statements, and ... will not set elections aside on the bases of misleading campaign statements." *Midland Nat'l Life Ins. Co.*, 263 NLRB 127, 133 (1982). Elections are set aside for misrepresentation only if a party has forged documents or altered Board documents during its campaign. *NLRB v. Best Prods. Co.*, 765 F.2d 903, 911 (9th Cir.1985); *NLRB v. Yellow Transp. Co.*, 709 F.2d 1342, 1343 (9th Cir.1983).

Because the Union's business agent's remarks did not constitute the sort of physical or economic threats that were present in *Baja's Place*, and because the Hearing Officer reasonably characterized the remarks as campaign propaganda, the Board properly overruled the Company's objections as to this issue.

## CONCLUSION

The Board correctly applied the law and substantial evidence on the record supports the Board's findings of fact. Because the Board acted within its discretion in overruling the Company's election objections, we enforce the Board's order that the Company violated sections 8(a)(1) and (5), 29 U.S.C. §§ 158(a)(1), (5), of the Act by refusing to bargain with the certified Union.

**ENFORCEMENT GRANTED.**