BITUMA CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

BITUMA CORPORATION, Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Petitioner.

Nos. 93–1901, 93–2268.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1993.

Decided May 11, 1994.

Robert W. Rasch, Orlando, FL, argued (Thomas P. Moran and Kelly T. Blystone, on the brief), for petitioner.

Margaret Luke, Washington, DC, argued, for respondent.

Before McMILLIAN, FAGG, and BOWMAN, Circuit Judges.

FAGG, Circuit Judge.

This labor law case arises from the certification of a union following a representation election victory at Bituma Corporation's asphalt production equipment plant in Marquette, Iowa. The issues raised involve the timing of the representation election, the voting eligibility of laid-off employees, and a pro-union employee's statements about Bituma to co-employees. After the International Association of Machinists and Aerospace Workers, AFL–CIO (the Union) won the election, the National Labor Relations Board (NLRB) certified the Union as the collective bargaining agent for Bituma's production and maintenance employees. To challenge the certification, Bituma refused to bargain with the Union, and the Union filed an unfair labor practice charge with the NLRB. The NLRB found Bituma violated 29 U.S.C. § 158(a)(1) and (5), and ordered Bituma to bargain with the Union. Bituma filed this appeal seeking review of its refusal to bargain. *See* 29 U.S.C. §§ 160(f), 159(d) (1988). In its cross appeal, the NLRB seeks enforcement of its bargaining order. We deny the petition for review and grant enforcement of the NLRB's order.

Bituma manufactures and distributes asphalt plants and other types of asphalt production equipment used to build and repair roads. Road builders place almost all of Bituma's production orders. Because roads are built primarily in the summer, the contractors place their orders in the autumn. Bituma begins producing asphalt plants in October, November, and December for delivery beginning in February and March. Bituma's orders for asphalt plants substantially decrease in the spring.

Bituma's work force fluctuates annually in conjunction with this production cycle. Bituma generally starts hiring extra workers in the autumn and reaches its peak employment of production and maintenance employees in January or February. According to an exhibit that Bituma introduced at the pre-election hearing, entitled "History of Terminations Due to Lack of Work," 209 was the average peak number of production and maintenance employees for the years 1985 to 1992. Throughout the summer months, Bituma lays off its excess work force (according to the exhibit, an average of 86 employees each year) due to lack of work. Bituma maintains a core staff of about 70 permanent employees during the slack period to produce parts for stock, provide spare parts, and service warranty items. When production increases again in the autumn, Bituma tries to recall laid-off employees and can usually recall 30 to 40%. Bituma employed 212 production and maintenance employees during its peak production season in the first part of 1992. In May 1992, Bituma laid off 89 (about 42%) of its production and maintenance employees. Unlike Bituma's earlier layoffs, Bituma gave the employees a written layoff notice that stated the layoff was not short-term and the possibility of recall was remote. In addition, the manager in charge of recalling employees told the laid-off employees he did not know when or if they would be recalled.

The Union filed a representation petition in May 1992, and in June the NLRB held a pre-election hearing. Bituma asked the NLRB to postpone the election until Bituma's next projected seasonal peak in February 1993, and also requested a decision on the voting eligibility of the 89 laid-off employees. The NLRB denied Bituma's requests and conducted a representation election in July 1992. In addition to Bituma's working employees, 35 of the 89 laid-off employees cast ballots. The NLRB challenged the ballots cast by the laid-off employees, and the 35 votes were not counted. The Union won the election by a vote of 61 to 59. Bituma objected to the election and the failure to count the challenged ballots. After conducting a postelection hearing, a hearing officer recommended upholding the NLRB's challenges to the 35 ballots and overruling Bituma's objections. The NLRB adopted the hearing officer's recommendations, and certified the Union.

■ On appeal, Bituma first argues the NLRB should not have directed an immediate election because Bituma did not have a substantial and representative complement of production and maintenance employees at its Marquette plant in June 1992. We disagree.

■ We review for abuse of discretion an NLRB decision to hold an election at a particular time. *NLRB v. Broyhill Co.*, 528 F.2d 719, 721 (8th Cir.1976); *NLRB v. Engineers Constructors, Inc.*, 756 F.2d 464, 467 (6th Cir.1985). To decide the appropriate time for an initial representation election when an employer has a fluctuating work force, the NLRB must balance two often-conflicting goals: insuring maximum employee participation in selecting a bargaining agent, and permitting current employees representation as quickly as possible. *NLRB v. AAA Alternator Rebuilders, Inc.*, 980 F.2d 1395, 1397 (11th Cir.1993); *NLRB v. Asbury Graphite Mills, Inc.*, 832 F.2d 40, 42 (3d Cir.1987); *Engineers Constructors*, 756 F.2d at 467; *see Broyhill*, 528 F.2d at 722. To strike a balance, the NLRB decides on a case-by-case basis whether the employer's present work force is "substantial and representative" of the projected future work force. *AAA Alternator Rebuilders*, 980 F.2d at 1397; *Asbury Graphite Mills*, 832 F.2d at 43. If so, the NLRB will direct a prompt election. *AAA Alternator Rebuilders*, 980 F.2d at 1397. The NLRB considers several factors in deciding whether the present work force is substantial and representative: the

size of the work force at the time of the representation hearing, the time expected to elapse before a full work force is present, the certainty of the projected increase, the job classifications currently filled, and the normalcy of current production. *Asbury Graphite Mills*, 832 F.2d at 42–43.

The hearing officer ordered an immediate election because the officer found Bituma's employee complement was substantial and representative. Substantial evidence supports this finding. At the time of the hearing, Bituma had 123 employees (58% of Bituma's average peak manufacturing complement), any seasonal peak would not occur for eight months, Bituma's termination notices cast doubt on any increase, and all job classifications were filled. *See id.* at 43 (work force was substantial and representative when one-third of projected employees present and all job classifications filled). As for the normalcy of Bituma's production, Bituma points out that its 70 permanent production and maintenance employees generally do not produce asphalt plants. At the time of the pre-election hearing, however, Bituma still had about 50 nonpermanent production and maintenance employees in addition to the permanent employees.

■ We agree with the NLRB that Bituma's operations were not seasonal enough to warrant postponement. Generally, a business is only seasonal enough to warrant postponement of a representation election until the next seasonal peak when employment increases by at least 100% in the peak season. *Broyhill*, 528 F.2d at 722 (citing cases and comparing current number of employees to peak number). Here, even if we assume an increase in February 1993 from 123, the number of employees at the time of the pre-election hearing, to 209, the average peak number of manufacturing employees, Bituma's work force would increase by only 70%. We thus conclude the NLRB did not abuse its discretion in directing an immediate election.

■ Second, Bituma argues the NLRB abused its discretion by refusing to decide the question of voter eligibility before the election and by failing to articulate a usable standard to decide voter eligibility. Before the election, the NLRB directed Bituma to include "temporarily laid-off" employees on the voting eligibility list. Bituma sought clarification of this standard as applied to its May 1992 layoff, but the hearing officer stated the NLRB would decide the eligibility question after the election. Because Bituma did not include any of the 89 laid-off employees on the voting eligibility list, none of the laid-off employees received official notice of the election. Nevertheless, 35 of the 89 laid-off employees voted. The NLRB challenged the 35 ballots, and after a postelection hearing, the hearing officer decided the 35 laid-off employees had no reasonable expectation of recall and thus their votes should not be counted. The officer noted the circumstances surrounding the layoff differed significantly from Bituma's past layoff history because employees were told the layoff was permanent in nature.

■ Bituma contends the NLRB's refusal to decide the laid-off employees' eligibility before the election denied Bituma its due process right to present evidence of the employees' eligibility to vote. The NLRB's practice of deferring the question of voter eligibility until after an election is an accepted NLRB practice that we review for abuse of discretion. *St. Elizabeth Community Hosp. v. NLRB*, 708 F.2d 1436, 1443 (9th Cir.1983). Contrary to Bituma's contention, the NLRB's deferral did not foreclose Bituma's right to present material evidence. Bituma could have placed the laid-off employees' names on the voter eligibility list, or the employees could have voted subject to challenge, and if the NLRB contested the employees' eligibility after the election, Bituma would have its opportunity to present evidence of the employees' eligibility at a postelection hearing. Indeed, 35 of the laid-off employees voted subject to challenge and the NLRB decided their eligibility after the election. The NLRB's practice of deferring the eligibility decision saves agency resources for those cases in which eligibility actually becomes an issue. We thus conclude the NLRB did not abuse its discretion in refusing to decide the laid-off employees' eligibility before the election.

■ In a related vein, Bituma asserts the NLRB's test for deciding the voting eligibility of laid-off workers is unworkable in Bituma's situation, precluding Bituma from placing the names of any laid-off workers on the voting eligibility list. The NLRB considers laid-off employees eligible to vote in a representation election if the employees have a reasonable expectation of recall in the foreseeable future. *Windsor Woodworking, Inc. v. NLRB,* 647 F.2d 859, 861 (8th Cir.1981); *Beloit Corp. v. NLRB,* 857 F.2d 1154, 1157 (7th Cir.1988); *NLRB v. L & B Cooling, Inc.,* 757 F.2d 236, 241 (10th Cir.1985). To decide whether an employee has a reasonable expectation of recall, the NLRB considers objective factors like the employer's past experience and future plans, and the circumstances surrounding the layoff, including the employer's statements to employees about the likelihood of recall. *Windsor Woodworking,* 647 F.2d at 861; *Beloit Corp.,* 857 F.2d at 1157, 1159–60. We reject Bituma's complaint that this test is unworkable. Voting eligibility necessarily depends on the unique facts of each employment situation, and the NLRB's test specifies objective considerations controlling eligibility. Courts have applied the test in similar situations. *See, e.g., NLRB v. Ideal Macaroni Co.,* 989 F.2d 880, 881–83 (6th Cir.1993); *Beloit,* 857 F.2d at 1156–60. We conclude the NLRB's "reasonable expectation of recall" test is a reasonable attempt to define voting eligibility in an objective way.

■ Third, Bituma argues the NLRB should have set aside the election results because the results were tainted by "deliberate and malicious lies" about Bituma circulated by a pro-Union Bituma employee, Daniel Teynor, one day before the election. On the eve of the election at a regular weekly Union meeting, Teynor, a member of the Union's in-plant organizing group, told other employees that Bituma had not paid his insurance premiums although it had deducted the premium money from his paychecks. Teynor warned employees they should be concerned about their insurance coverage. The parties dispute whether Teynor said the insurance company had not paid his claim. Although Teynor's claim was unpaid for three months, the insurance company eventually paid his

claim more than a month before the meeting. The morning after the meeting, Bituma's personnel supervisor learned what Teynor had said and contacted the insurance company. The company told the supervisor that the company's computers erroneously showed Bituma's premiums were not paid. The company sent the supervisor a copy of the check paying Teynor's claim and a letter stating Bituma had always timely paid its premiums. The supervisor showed the check and letter to about 30 employees on the day of the election. Three of those employees testified they each told 10 to 15 other employees about the payment.

■ We do not set aside representation elections lightly. *Millard Processing Servs., Inc. v. NLRB,* 2 F.3d 258, 261 (8th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 922, 127 L.Ed.2d 215 (1994). The Board has a wide degree of discretion in deciding whether to set aside an election. *Id.* When an objection is based on allegations of oral or written representations made during an election campaign, the NLRB now applies *Midland Nat'l Life Ins. Co.,* 263 N.L.R.B. 127 (1982). *See NLRB v. Monark Boat Co.,* 713 F.2d 355, 360 (8th Cir.1983) (explaining NLRB's changes in position); *St. Margaret Mem. Hosp. v. NLRB,* 991 F.2d 1146, 1157 n. 11 (3d Cir.1993) (citing NLRB decisions applying *Midland* to oral representations). Under *Midland,* the NLRB and courts will not probe into the truth or falsity of the representations. 263 N.L.R.B. at 133. This is so because employees are sophisticated enough to recognize campaign propaganda and weigh it accordingly. *See id.* at 130. Consistent with this view, *Midland* holds that elections cannot be set aside merely on the basis of misleading representations, but can be set aside only when a representation is deceptively made rendering the employees unable to recognize the representation as campaign propaganda. *Id.* at 133, 131.

Bituma argues the election should be set aside under *Midland* because Teynor misrepresented that his claim was not paid and this misrepresentation was deceptively made. The hearing officer found there was no evidence that the Union or Teynor were en-

gaged in any deceptive practices that would warrant setting aside the election under *Midland.* The record contains substantial support for this finding. As Bituma states in its brief, Teynor was a member of the Union's in-plant organizing group. To gain Union support, he visited other employees' homes and handed out Union literature. Teynor made the statements about his insurance problems at a weekly Union meeting. Because Teynor was openly campaigning for the Union and Teynor made the statements at a regular Union meeting, the other employees could recognize the representation as potential Union propaganda rather than a personal message from a fellow worker. *See Dayton Hudson Dep't Store v. NLRB,* 987 F.2d 359, 365 (6th Cir.1993). By stating the employees should be concerned about their insurance coverage, Teynor was suggesting a benefit of unionization, i.e., protection of insurance benefits, and thus, Teynor's statement was campaign propaganda. *See NLRB v. Cal–Western Transp.,* 870 F.2d 1481, 1488 (9th Cir.1989).

Further, Teynor's account of his insurance problems was substantially correct. *See NLRB v. Superior Coatings, Inc.,* 839 F.2d 1178, 1182 (6th Cir.1988); *NLRB v. Krafcor Corp.,* 712 F.2d 1268, 1269–71 & 1270 n. 1 (8th Cir.1983). Bituma's own witnesses testified the insurance company notified them Bituma had not paid their premiums, and Teynor had experienced a three-month delay in getting reimbursed for a claim. In addition to Teynor's denial, most of the employees who testified about Teynor's statements at the Union meeting stated they did not recall Teynor saying his insurance claim had not been paid. As the hearing officer recognized, even if Teynor falsely said his claim had not been paid, it would be nothing more than a misrepresentation, which is not a proper basis for setting aside an election under *Midland. See* 263 N.L.R.B. at 133. Bituma does not argue we should recognize an exception to *Midland. See St. Margaret Mem. Hosp.,* 991 F.2d at 1158 (citing courts that have carved exception to *Midland* rule). We conclude the NLRB did not abuse its discretion in deciding not to set aside the election.

 Finally, we reject Bituma's argument that the election and bargaining order are void because the employer was identified as "Gencor Bituma Corporation," a nonexistent legal entity. *See NLRB v. Mattison Mach. Works,* 365 U.S. 123, 123–24, 81 S.Ct. 434, 435, 5 L.Ed.2d 455 (1961) (per curiam) (minor and unconfusing mistake in employer's corporate name in notice of election did not void election).

Accordingly, we deny the petition for review and grant enforcement of the NLRB's bargaining order.