995 F.2d 1066
 144 L.R.R.M. (BNA) 2056
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
DIGITRON PACKAGING, INC., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.
 Nos. 92-5316, 92-5487.
 United States Court of Appeals, Sixth Circuit.
 June 1, 1993.
 
 Before: JONES and SUHRHEINRICH, Circuit Judges; and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Digitron Packaging, Inc. ("Digitron") petitions for review of and the National Labor Relations Board (the "Board"), in its cross-application, seeks enforcement of a Board order issued on February 21, 1992 commanding Digitron to bargain with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO (the "Union"). For the reasons that follow, we deny Digitron's petition for review and we grant the Board's petition for enforcement of its February 21, 1992 order.
 
 I.
 
 2
 Digitron is a contract packager in the business of repackaging automobile parts for shipment. On November 13, 1990, the Union filed a petition for a representation election involving all full-time and regular part-time employees at Digitron's facility in Livonia, Michigan.
 
 
 3
 An election was held on January 18, 1991. The final tally of votes showed that of the seventy-two votes cast, thirty-two were for the Union and twenty-eight were against the Union. Twelve votes were not counted because those votes were successfully challenged as being votes of supervisors.
 
 
 4
 After the election, Digitron filed objections to the election. Digitron contended that the pro-union activity by production analysts had a coercive effect on employees, thus tainting the election. Digitron pointed to several instances which it contended showed that production analysts improperly solicited or coerced employee votes. The activity by the production analysts which Digitron objected to can be divided into three categories: 1) pre-election day meetings, which encompasses activity that occurred at several meetings which were held in an attempt to organize the employees; 2) miscellaneous statements, which include various statements attributed to some of the production analysts; and 3) election day activities, which include what took place during the time the production analysts were in the polling area the day of the election. Digitron also objected to the action of the Board Agent in allowing the production analysts, which Digitron claims were known to her to be supervisors, to enter and remain in the polling area during the January 18, 1991 election.
 
 
 5
 A Hearing Officer held a hearing concerning Digitron's objections. In his report and recommendation, the officer noted the following was testified to at the hearing:
 
 A. Pre-Election Day Meetings
 1. Initial Meeting at Union Hall
 
 6
 In early November 1990, an initial meeting of employees was held to discuss the possibility of organizing. Carlos Toro, a packer at Digitron, testified that while there were authorization cards signed at the meeting, no production analysts encouraged employees to sign the cards.
 
 
 7
 Alan Talluto, a former production analyst who was promoted to general supervisor, testified that he was also present at the November 1990 meeting and that Michael Robertson, a production analyst, played a lead role at the meeting. Talluto testified that Robertson was " 'sitting up front doing a lot of talking, a lot of one on one conversation with Tom' (Ziembovic[, a Union organizer]." J.A. at 12. Talluto testified that Robertson stated that if more than fifty percent of the employees signed authorization cards, the Union automatically became the bargaining representative. Talluto noted that Robertson did not ask employees to sign authorization cards for the Union, however.
 
 2. Wonderland Mall Meeting
 
 8
 Toro also testified that he was present at a meeting which was held during the third week of December 1990 at the Wonderland Mall in Livonia. At that meeting, there were approximately six to eight employees and seven production analysts. Toro testified that at the meeting Robertson expressed his support for the Union to employees who were sitting with him at a table. In addition, Robertson stated that the employees might get fired without a union and that if the Union was voted in, employees would get more benefits.
 
 
 9
 Talluto was also present at the Wonderland Mall meeting. Talluto testified that Robertson conducted the meeting and, in response to a question, told a group of about ten employees that Digitron knew who had signed the authorization cards and that if the Union did not get voted in, those employees would be discharged.
 
 
 10
 Robert Sleeper, a production analyst, testified that at the Wonderland Mall meeting no one employee or production analyst dominated the meeting and denied that Robertson told employees that they would be discharged or laid off by Digitron.
 
 3. Archie's Restaurant Meeting
 
 11
 Talluto was also in attendance at a meeting held on December 21, 1990 at Archie's Restaurant. At this meeting, there were seven production analysts and one packer, Mable Whitehurst. Ziembovic was also present. Talluto testified that Ziembovic told the production analysts that Digitron was going to contend that they were supervisors and that their votes would be challenged at the election.
 
 B. Miscellaneous Statements
 
 12
 Phyllis Huff testified that Sleeper told her about a month and a half before the election that he supported the Union. Huff admitted that they were " 'casually talking' " when Sleeper expressed his support for the Union. Id. at 13. In addition, Huff testified that she did not hear any production analyst threaten any employee regarding how the employees should vote. Sleeper denied that he ever told employees how he felt about the Union.
 
 
 13
 Jim Holliday, a maintenance employee, testified that a week prior to the election he heard Robertson state to four employees that the employees needed the Union and that there would be trouble if the employees did not select the Union as their bargaining representative. Holliday also stated that this was the only time he heard a production analyst speaking about the Union.[1]
 
 C. Election Day Activities
 
 14
 The Hearing Officer found that the voting was held from 1:30 p.m. to 2:30 p.m. in the office conference room. At 2:00 p.m., Digitron called a meeting of the production analysts in Dick Racine's office. Racine was Digitron's Operations Manager. At the same time, seven production analysts came to the voting area and stood in line to vote. Racine testified that when he noticed that only five production analysts appeared for the 2:00 p.m. meeting, he concluded that the remaining production analysts had gone to vote. Racine then testified that he allowed the production analysts at the meeting to go and vote.
 
 
 15
 Talluto testified that while he was in line to vote he heard employees make comments to him and other production analysts who had attended the 2:00 p.m. meeting. Those comments indicated that those production analysts were sent to counteract the seven votes of the production analysts who had not attended the meeting before coming to vote. Talluto testified that Whitehurst began "pointing at employees in line and stating that with these employees voting they did not have a chance." Id. at 16.
 
 
 16
 Holliday testified that he was asked by Racine to accompany another employee to the voting area because Racine was concerned that this employee would be intimidated. Holliday testified that this employee ducked behind him after seeing Whitehurst. Holliday also testified that he saw four production analysts in line to vote and that the employees seemed to be upset that the production analysts were voting. Holliday testified that while in line he did not hear the production analysts say anything about the Union or make any statements to employees as to how they should vote.
 
 
 17
 Robertson was one of the production analysts who did not go to the 2:00 p.m. meeting. Robertson stated that he was in line for about two minutes, voted, and then left the voting area. He denied speaking about the Union while waiting in line to vote. Sleeper testified that he and the six other production analysts who had not attended the meeting were in a group and that he was in line for about 45 minutes.
 
 
 18
 Toro testified that on the day of the election, Robertson and another production analyst, Dorothy Garrett, asked him how he was going to vote. Toro testified that Robertson did not ask this question in a threatening manner. Toro also stated that he did not see any production analysts attempting to influence employees on the day of the election.
 
 
 19
 In addition to noting the foregoing testimony, the Hearing Officer found that the production analysts were supervisory personnel within the meaning of Section 2(11) of the Labor Management Relations Act, 29 U.S.C. § 152(11) (1988) [hereinafter the "Act"]. In support of this finding, the Hearing Officer stated:
 
 
 20
 The record establishes that [production analysts] are the highest paid individuals in the production portion of the Employer's operation. They do not have a regular assigned work location on the production line but instead have their own standing work desks at the beginning of each line. They wear a green apron to distinguish them from the rest of the production employees, who wear regular street clothes. In addition to each secondary indicia of supervisory status, the credible record evidence establishes that the production analysts have some limited authority to transfer packers from one location on the line to another and orally warn employees regarding their work performance. Furthermore, there is evidence that the production analysts can check packers [sic] work and if not satisfied with the work have them redo it. I find such to be an exercise of responsible direction and indicative of a supervisor's use of independent discretion.
 
 
 21
 J.A. at 9.
 
 
 22
 After finding that the production analysts were supervisory personnel, the Hearing Officer found that the pre-election actions and comments, including the miscellaneous statements, attributed to the production analysts--namely Robertson and Sleeper--were not made to coerce the employees to vote for the Union or face retaliation.[2] As for the production analysts' election day actions, the Hearing Officer stated:
 
 
 23
 ... I would not find the actions of the production analysts in attempting to vote sufficient to constitute a basis for overturning the election. There was no testimony presented by any witness that the production analysts while in line attempted to even start a conversation with another employee other than Mable Whitehurst let alone attempt to coerce employees regarding their vote.
 
 
 24
 Id. at 17. The Hearing Officer also found that the Board Agent engaged in no improper action on the day of the election by allowing the production analysts to cast challenged ballots.
 
 
 25
 As a result, the Hearing Officer recommended that Digitron's objections be overruled. On September 30, 1991, the Board adopted the Hearing Officer's report and recommendation and certified the Union as the collective bargaining representative for the employees. Thereafter, Digitron refused to bargain with the Union. The Union filed a charge with the Board alleging that Digitron refused to bargain with the Union. The Board's General Counsel issued a complaint alleging that Digitron's refusal to bargain with the Union violated Sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5) (1988). In its answer, Digitron conceded that it refused to bargain. It alleged that the Union was not properly certified. The Board's General Counsel then filed a motion for summary judgment with the Board.
 
 
 26
 On February 21, 1992, the Board granted the General Counsel's motion for summary judgment, finding that Digitron was seeking only to relitigate issues determined in the representation proceeding. The Board found that Digitron's refusal to bargain violated 29 U.S.C. §§ 158(a)(1) and (5).
 
 
 27
 The Board's accompanying order requires Digitron, among other things, to cease and desist from refusing to bargain. The order directs Digitron to bargain with the Union and furnish relevant information, to embody any understanding in a signed agreement, and to post a remedial notice.
 
 II.
 
 28
 The issue we are faced with is whether the Board, in overruling Digitron's objections and certifying the Union, acted within the "wide degree of discretion" entrusted to it by Congress in resolving questions arising during the course of representation proceedings. Tony Scott Trucking, Inc. v. NLRB, 821 F.2d 312, 313 (6th Cir.), cert. denied, 484 U.S. 896 (1987). We must consider whether the Board acted reasonably in overruling Digitron's election objections and certifying the Union and whether substantial evidence supports the Board's actions. John M. Horn Lumber Co. v. NLRB, 859 F.2d 1242, 1243-44 (6th Cir.1988); Hickman Harbor Serv. v. NLRB, 739 F.2d 214, 218 (6th Cir.1984).
 
 As we stated in Hickman Harbor :
 
 29
 To set aside a representation election it must be proven the election was conducted improperly. Moreover, it must be shown "not only that unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." If the Board's factual findings in this area are "reasonable in light of the proven facts," they must be upheld. However, we will not give a factual finding "more weight than in reason and in the light of judicial experience [it] deserve[s]."
 
 
 30
 739 F.2d at 218 (citations omitted).
 
 
 31
 In its petition, Digitron raises two major issues. First, Digitron argues that the Board erred in not finding that the Union's enlistment and utilization of supervisory personnel in its campaign immediately prior to the election and during the pre-election period coerced eligible voters into voting pro-Union. Second, Digitron argues that the Board erred in not finding that the election, whose tally was close, should be set aside because "campaigning and electioneering engaged in on behalf of the Union and the extended presence of supervisors in the voting area and other serious irregularities in the conduct of the election destroyed laboratory conditions essential to the conduct of a free and fair election." Petitioner's Br. at 3.
 
 A.
 
 32
 Substantial evidence supports the Board's finding that none of the production analysts, except for Robertson and Sleeper, played a significant role in the organizing campaign. While several production analysts attended meetings at the union hall and at the mall, none of them, including Robertson and Sleeper, distributed authorization cards to employee or solicited their signatures.
 
 
 33
 Substantial evidence also supports the Board's finding that Robertson's conduct did not have a tendency to coerce employees into voting for the Union out of fear of retaliation by Robertson or Sleeper. Robertson made no secret of his support for the Union: he shared a platform with Union organizer Ziembovic at the union hall meeting; he spoke in favor of the Union at the mall meeting; he stated at the mall meeting that Digitron knew who had signed union cards and that these employees "might get fired" if the Union lost the election; he stated, about a week before the election, that "there would be trouble" if the Union was rejected; and he was the first production analyst to line up to vote on election day. Similarly, Sleeper expressed his support for the Union to an employee. While those actions may indicate unwavering support for the Union, those activities do not necessarily destroy a free and fair election. As stated by the Ninth Circuit, "Talking to employees about the union, expressing personal views about the union, and answering questions about the union are permissible expressions of opinion when made in noncoercive and nonthreatening circumstances." NLRB v. Hawaiian Flour Mill, Inc., 792 F.2d 1459, 1464 (9th Cir.1986).
 
 
 34
 Substantial evidence supports the Board's finding that Robertson's and Sleeper's actions and comments were made under noncoercive and nonthreatening circumstances. While the Hearing Officer correctly found that the production analysts were supervisors, see, e.g., NLRB v. Roselon Southern, Inc., 382 F.2d 245, 247 (6th Cir.1967), it is important to note that the production analysts had minimal ability to reward or retaliate against employees: they had limited authority to reassign the packers to other jobs on the line(s) which they supervised; they had limited disciplinary authority; and they made only the initial contribution to the multi-stage evaluation process. The production analysts occupied the bottom rung of Digitron's supervisory hierarchy. As a result, it was unlikely that Robertson's or Sleeper's audience would treat these statements as something other than Robertson's or Sleeper's personal speculations or feelings. Under these circumstances, the Board reasonably concluded that Sleeper's statement to Huff was noncoercive. Even Huff stated that it was noncoercive. Furthermore, the Board reasonably concluded that Robertson's position provided no basis for his assertion about the likelihood of company reprisals against Union supporters if the Union was rejected.
 
 
 35
 In addition, it was reasonable for the Board to credit Toro's and Holliday's testimony concerning Robertson's comments and Huff's testimony concerning Sleeper's statement and to discredit other witnesses' testimony. As we have stated previously, this Court is in no position to substitute its judgment on issues of credibility for the Hearing Officer's judgment. Colfor, Inc. v. NLRB, 678 F.2d 655, 656 (6th Cir.1982); accord NLRB v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984) (credibility resolutions of a hearing officer " 'who has observed the demeanor of the witnesses' " are not normally disturbed) (citation omitted). The Hearing Officer commented about the general credibility of each witness he credited or discredited and he detailed the surrounding circumstances which may have made one witness' testimony more believable than another witness' testimony. See id. Digitron offers no persuasive reason for disturbing the Hearing Officer's credibility resolutions in this case.
 
 
 36
 We also note that any coercive impact of pro-Union activity was mollified by the fact that of the twelve production analysts, only Robertson, and to a far lesser extent, Sleeper, were engaged in pro-Union activity during the pre-election period. See Hawaiian Flour Mill, 792 F.2d at 1464 (in finding pro-union activity to be non-coercive, the court noted that only one supervisor was engaged in pro-union activity).
 
 
 37
 Digitron cites to Sheraton Motor Inn, 194 N.L.R.B. 733, 733-34 (1971) as precedent for setting aside an election due to supervisory support of the Union. In Sheraton Motor Inn, the supervisor in question had considerable authority over the employees whom he had solicited to join the Union and this authority was concentrated in a single individual. The authority of the production analysts in the instant case does not reach the level of authority found in Sheraton Motor Inn. In addition, since there were twelve production analysts, authority was not concentrated in one individual supervisor. This is especially significant because, as stated before, only two production analysts made pro-Union statements, thus militating against the perception that all the supervisors were pro-Union.
 
 
 38
 In addition to the level of authority held by the production analysts, the other cases cited by Digitron can be distinguished by the level of pro-union activity undertaken by the supervisors. In Roselon Southern, 382 F.2d at 247, the supervisors in question actually signed up employees who were working under them. In the instant case, there is no evidence that any of the production analysts in question actually signed up any of the employees to join the Union. In NLRB v. Island Film Processing Co., 784 F.2d 1446, 1452-53 (9th Cir.1986), the supervisors signed authorization cards in front of employees and engaged in almost continuous conversation at the work place. Additionally, all of the supervisory personnel vocalized their support of the Union to the employees who voted. In the instant case, the conduct of the supervisors did not rise to this same level of influence. No production analyst signed authorization cards or engaged in the type of continual pro-union conversation described in Island Film. The Board determined that the actual statements in question were limited to three or four made by two out of a total of twelve production analysts.
 
 
 39
 In Delchamps, Inc., 210 N.L.R.B. 179, 179-80 (1974), the supervisors in question had joined the union and solicited employees who worked under them to do the same. A number of the supervisors were on the union's organizing committee and they distributed, solicited signatures to, and collected cards for the union. The supervisors also attended union meetings and urged employees to do the same. In addition, they wore union pins and urged employees to vote for the union. Although there was no finding that the supervisors made threats that the employees under them would not receive wage increases and would suffer other adverse treatment if they did not support the union, the Hearing Officer determined, and the Board agreed, that "because the authorities possessed and exercised by the [supervisors] are of the type which greatly affect working conditions" the supervisors pro-union activity would tend to restrain employees in their right to freely exercise their vote. Id. at 180.
 
 
 40
 Again, the level of supervisory activity in the instant case simply does not rise to the same level as found in Delchamps. Unlike the supervisors in Delchamps, the production analysts who did support the Union did not actually join the Union, much less hold positions on Union committees. There is no evidence that any of the production analysts actually solicited signatures, distributed or picked up Union authorization cards from any of the employees. Nor is there any evidence that the production analysts ever asked an employee to vote for the Union. Additionally, as previously stated, the level of authority possessed by the production analysts was not of the type to greatly affect the working conditions of the packers.
 
 B.
 
 41
 Digitron also contends that the Board Agent impermissibly allowed the production analysts to line up and vote and that improper conversations between the production analysts and employees waiting to vote impaired the employees' freedom of choice.
 
 
 42
 We conclude that substantial evidence supports the Board's conclusion that the Board Agent did nothing improper. As stated by the Hearing Officer:
 
 
 43
 the Board Agent's action in allowing the production analysts to enter the polling place was proper since there had been no determination by the National Labor Relations Board regarding the status of the production analysts and their eligibility to vote in the election.
 
 
 44
 J.A. at 17. We agree with that determination.
 
 
 45
 As to the alleged conversations between the production analysts and the employees at the voting center, we find that substantial evidence supports the Board's determination that there were not conversations between the two groups which would have impeded a free and fair election. As Toro testified, he did not feel threatened by Robertson's question about how he was going to vote.[3]
 
 III.
 
 46
 We have reviewed Digitron's other contentions and find that they are without merit. Based on the foregoing, we deny Digitron's petition for review and we grant the Board's petition for enforcement.
 
 WELLFORD, Senior Circuit Judge, dissenting:
 
 47
 This was an exceedingly close election wherein a change of mind of two voters out of seventy-two ballots cast could have modified the result of the election. Several "production analysts," who the union conceded were "supervisors," actively participated in, or conducted, pre-election organizational activities and meetings in open support of the union. Throughout the campaign, these supervisors continued to make various statements to employees showing strong support for the union. During the election these same supervisors were in the polling area carefully observing the employees who were about to vote, and in at least one instance, asked an employee how he was going to vote. At least one production analyst warned or threatened that "employees might get fired without a union."[1] Another told an employee to vote for the union "so that he would not suffer retaliation."
 
 
 48
 In another case involving supervisory involvement and potential coercion in an organization campaign, and in the ensuing election, we have held that the election should be set aside even though the vote was not close as in this case. NLRB v. Roselon Southern, 382 F.2d 245 (6th Cir.1967). It seems self-evident that the Board is required to examine with particular care the likely effects of fear and intimidation upon employees brought about by supervisory intervention in a union organization campaign where the election margin is a very narrow one. In our review of a case of this kind involving improper supervisory activities, our sensitivity to the potential of employee apprehension (or misapprehensions) must increase in inverse proportion to the margin of the election result. (The smaller the margin, the greater concern about effect of supervisory over-reaching and influence upon the election result.) See C.J. Krehbiel Co. v. NLRB, 884 F.2d 880 (D.C.Cir.1988); Jamesway Corp. v. NLRB, 676 F.2d 63, 71 (3d Cir.1982).
 
 As the Ninth Circuit has noted:
 
 49
 Active supervisory participation in a union organizing campaign destroys laboratory conditions and prevents employees from exercising an uncoerced vote. Such involvement requires an election to be set aside.... The courts, however, have never required actual proof of coercion. Supervisory activity need only "reasonably tend" to have a coercive effect on or "likely to impair" an employees choice.... Implied threats of retaliation suffice to taint an election.
 
 
 50
 NLRB v. Island Film Processing Co., Inc., 784 F.2d 1446, 1451 (9th Cir.1986) (citations omitted). Island Film emphasized the power of supervisors to reward or punish employees under their direction and control, regardless of whether the supervisors were deemed to occupy only "minor" supervisory roles. Island Film, 784 F.2d at 1450; see also NLRB v. Cal-Western Transportation, 870 F.2d 1481, 1484 (9th Cir.1989) ("supervisory support will invalidate the Union's victory if its [sic] reasonably tends to have a coercive effect on or is likely to impair an employee's choice"). (Emphasis added). All that need be shown is that "the supervisor's conduct creates either an impression that the employer favors the union or a fear of future retaliation." Cal-Western, 870 F.2d at 1484 (citing NLRB v. Hawaiian Flour Mill, 792 F.2d 1459, 1462 (9th Cir.1986)).
 
 
 51
 It has frequently been held that the participation of a supervisor in a union election undermines the "laboratory conditions" necessary for an unfettered choice.... As explained in various Board opinions, the threat posed by the participation of a supervisor is twofold. First, if a supervisor takes a stance in favor of the Union, even though the employer does not otherwise indicate its position, his association with the management hierarchy, in an employee's perception, could indicate employer support for the Union. Second, if a supervisor influences hiring and firing or in other respects holds substantial power over an employee, the supervisor's participation in the election could have a coercive effect on other employees.
 
 
 52
 NLRB v. Handy Hardware Wholesale, Inc., 542 F.2d 935, 938 (5th Cir.1976), cert. denied, 431 U.S. 954 (1977) (citations omitted).
 
 
 53
 Another court reached the same result and set aside a union election[2] where supervisory action and pro-union "pressure upon employees" was deemed to be coercive. Turner's Express, Inc. v. NLRB, 456 F.2d 289, 291 (4th Cir.1972). Much like this case, the supervisors in Turner's Express made statements in favor of the union, encouraged a union organizer to commence his efforts, interrogated employees, and questioned how they would vote. Turner's Express also relied upon NLRB v. Roselon Southern, 382 F.2d 245 (6th Cir.1967), among other authorities, for its decision, maintaining that "[i]t is not necessary that it be proved that such pressure and coercion affected the result of the voting." Turner's Express, 456 F.2d at 291.
 
 
 54
 Taken in context and in light of the entire record, it seems clear that the hearing officer and the Board simply failed to take into account the extent of supervisory activity clearly coercive in nature and prone to bring about employee fear of retaliation if the union did not prevail. While the effort of the production analysts, urged on by the union, to attempt to vote would not be sufficient to overturn the election, this also tended to upset other employees, according to the testimony in the record.
 
 
 55
 "[A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Jamesway Corp. v. NLRB, 676 F.2d 63, 66 (3d Cir.1982) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).
 
 
 56
 Accordingly, I would find that the Board exceeded its discretion, and acted without substantial support in the record by failing to find that the supervisory irregularities and misconduct present here precluded a free and fair election. I would, therefore, reverse the Board's decision and set aside the election.
 
 
 
 [1]
 Additional statements by production analysts were described by another packer, Sergio Filas. Filas' testimony, however, was rejected by the Hearing Officer. After initially being unwilling to testify, Filas was found to be "very nervous," "unsure of himself" and "unsure of his answers" by the Hearing Officer. J.A. at 13. The officer also found that Filas' testimony suffered from a "general lack of specifics." Id. The Hearing Officer determined that "based on his demeanor as a witness I have not relied in any way on his testimony and I reject it as a basis for any findings of fact." Id
 
 
 [2]
 The Hearing Officer discredited certain testimony. He discredited Talluto's testimony to the extent that it contradicted Toro's version of what Robertson said at the Wonderland Mall meeting. The Hearing Officer stated that "Toro's version of Robertson's statement that employees 'might' be discharged is a more credible version." Id. at 12. The Hearing Officer determined that since Robertson was a low-level supervisor, it was highly unlikely that Digitron would have told Robertson of its plans. As a result, the Hearing Officer concluded that Robertson was merely speculating as to what Digitron would do and he was merely speaking of the possibility of Digitron action. Thus, the Hearing Officer concluded, "based on the demeanor of the witnesses and the inherent probabilities of the events set forth in witness testimony I credit Toro in this regard." Id. The Hearing Officer discredited Sleeper's testimony with respect to the denial of Robertson's statement made at the Wonderland Mall meeting. In addition, the officer rejected Sleeper's testimony with respect to his denial that he told Huff that he supported the Union
 
 
 [3]
 We also note that Digitron allowed several of the production analysts to leave a meeting that it had previously called, stand in line, and vote. To some degree, Digitron contributed to the situation that it now finds objectionable by encouraging the analysts to vote at that particular time. It may not now complain of the results of its inaction. See, e.g., NLRB v. Welfed Catfish, Inc., 674 F.2d 1076, 1079-80 (5th Cir.1982); Fall River Sav. Bank v. NLRB, 649 F.2d 50, 56 n. 5 (1st Cir.1981)
 
 
 [1]
 Whether the supervisor's statement was "would be discharged," or "might be discharged," if the employee did not support the union is of little consequence. Also, whether the most active union adherent, Robertson, a production analyst, was only a "low-level supervisor" is not important; he was a supervisor who had "independent discretion" and "responsible direction" authority
 
 
 [2]
 The election resulted in 32 votes for the union and 22 against, 6 votes being challenged