## CALIFORNIA DEPARTMENT OF HEALTH SERVICES, Creditor-Appellant,

v.

## Timothy L. DONOVAN, Trustee for Community Hospital of the Valleys, Trustee-Appellee.

### No. 86–5945.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1987.

Decided June 29, 1987.

G.R. Overton, Los Angeles, Cal., for creditor-appellant.

Philip B. Wagner, San Bernardino, Cal., for trustee-appellee.

Before PREGERSON and NORRIS, Circuit Judges, and REED,* District Judge.

* Honorable Edward C. Reed, Jr., United States District Judge, District of Nevada, sitting by

## PER CURIAM:

We review an order of the bankruptcy court confirming a plan of reorganization for debtor Community Hospital of the Valleys. The Bankruptcy Appellate Panel affirmed the order. *California Dep't of Health Servs. v. United States Bankruptcy Court (In re Community Hospital of the Valleys)*, 51 Bankr. 231 (Bankr. 9th Cir.1985). On appeal to this court pursuant to 28 U.S.C. § 158(d), California Department of Health Services, an unsecured creditor of the debtor hospital, makes the same arguments that it made before the Bankruptcy Appellate Panel. We affirm for the reasons stated in the opinion of the Bankruptcy Appellate Panel.

AFFIRMED.

## MICRONESIAN TELECOMMUNICATIONS CORPORATION, Petitioner/Cross-Respondent,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner.

### Nos. 86–7341, 86–7404.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1987.

Decided June 29, 1987.

As Amended Sept. 2, 1987.

designation.

William Malone, Stamford, Conn., for petitioner-cross-respondent.

Kenneth B. Hipp, Washington, D.C., for respondent-cross-petitioner.

Before POOLE, NORRIS and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

## I

## OVERVIEW

Micronesian Telecommunications Corp. (MTC) petitions for review of an NLRB order directing it to bargain with the International Brotherhood of Electrical Workers Local 1357. The NLRB has filed a cross petition for enforcement of its order.

## II

## FACTS AND PROCEEDINGS BELOW

The Northern Mariana Islands are the sixteen northern-most major islands in the Micronesian Chain. Saipan, the largest of these islands, lies 3900 miles west of Honolulu, and 5600 miles southwest of Los Angeles. Guam is 45 miles south of Rota, 135 miles south of Tinian, and 150 miles south of Saipan.

Saipan has a population of approximately 17,000 inhabitants; 87% of the total population of the Northern Marianas. The dominant ethnic group within the Northern Marianas population is the Chamorros, who are of the same origin as the indigenous Guamanians.

The Japanese ruled the Mariana Islands from the beginning of World War I until the United States invaded Saipan in June of 1944. From then until 1947, when the United Nations designated Micronesia as a Trust Territory, these islands were an American possession. From July 1947 to November 1986, the United States administered the Northern Mariana Islands as part

of the United Nations Trust Territory of the Pacific Islands (TTPA). Under the Trust Agreement citizens of the Northern Mariana Islands were not citizens or nationals of the United States.

In 1976, the United States and the Northern Mariana Islands entered into a "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America" (the 1976 Covenant). This covenant was approved by a unanimous vote of the Northern Mariana Legislature, and by a 78.8% vote of the citizens of the Northern Marianas before being enacted into law by the United States Congress.

Some of the provisions of the 1976 Covenant became effective immediately upon its approval by the Northern Mariana Islands District Legislature, the People of the Northern Marianas and the United States Congress. *See* 1976 Covenant § 1003(a), *reprinted in* 48 U.S.C.A. § 1681 at 306 (Supp. 1987). Other provisions became effective on January 9, 1978 by Presidential Proclamation. *See* 1976 Covenant § 1003(b), *reprinted in* 48 U.S.C.A. § 1681 at 306 (Supp. 1987); Proclamation No. 4534, 42 Fed. Reg. 56,593 (1977), *reprinted in* 42 U.S.C.A. § 1681 at 307–08 (Supp. 1987). Sections 1002 and 1003(c) of the 1976 Covenant provide that by proclamation of the President of the United States and the remainder of the 1976 Covenant was to become effective "upon the termination of the Trusteeship Agreement and the establishment of the Commonwealth of the Northern Mariana Islands." 1976 Covenant §§ 1002, 1003(c) *reprinted in* 48 U.S.C.A § 1681 at 306 (Supp. 1987). The President of the United States signed Proclamation No. 5564, 51 Fed. Reg. 40,399 (1986), on November 3, 1986, terminating the Trusteeship Agreement with respect to the Northern Mariana Islands as of November 3, 1986.

The petitioner, MTC, began operations in 1976, and operates approximately three thousand telephones on the islands of Saipan, Rota, and Tinian. On October 21, 1982, the International Brotherhood of Electrical Workers Local 1357 ("the Union") sought to represent employees of MTC in the Mariana Islands and petitioned for a representation election.

MTC opposed the petition, but on December 14, 1984 the Regional Director for the NLRB issued a decision and direction of election. On January 10, 1985, an election was conducted and of the 52 employees eligible to vote, 24 voted for the Union, and 20 voted against. MTC objected that the elections were tainted by impermissible government involvement and improper inducements. The Regional Director investigated the allegations, and on February 28, 1985, issued a report on the objections. MTC objected to the report, but on September 25, 1985, the Board issued a "Decision and Certification of Representative" and designated Local 1357 the exclusive collective bargaining representative of MTC.

On October 11, 1985, MTC notified the Union that it would not recognize or bargain with the Union, because it believed the Board's decision was erroneous. MTC was charged with refusal to bargain, and the Regional Director issued a complaint and Notice of Hearing. On May 23, 1986, a motion for summary judgment filed on behalf of the NLRB was decided against MTC and directed MTC to cease and desist from its refusal to bargain with the Union. This petition for review followed. The Board filed a cross-petition for enforcement.

## III

## ANALYSIS

MTC raises two issues in its petition. It argues that (1) the NLRB was without jurisdiction to order the representation election for employees in the Northern Mariana Islands, and (2) the Board abused its discretion in certifying the Union without holding a hearing on the employer's objections.

**A. Jurisdiction.**

1. *Standard of Review.* "Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963). The Board's con-

struction of terms in the National Labor Relations Act (NLRA) that establish its statutory jurisdiction must be upheld if that construction is "reasonably defensible." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 891, 104 S.Ct. 2803, 2808, 81 L.Ed.2d 732 (1984).

2. *Applicability of the NLRA.* MTC argues that the NLRA does not apply to the Northern Mariana Islands because it is only applicable to commerce "among the several States, or between ... any Territory of the United States and any State or other Territory...." MTC states that since the TTPI was not a state or territory[1] within the meaning of the Act, the NLRA does not apply of its own force, and Congress has not made the NLRA applicable to the TTPI.

The jurisdictional breadth of the NLRA was intended by Congress to encompass the full extent of Congress' power to regulate commerce, *NLRB v. Reliance Fuel Oil*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963), and the term "Territory" as used in Section 2(6) of the NLRA, 29 U.S.C. § 152(6), must be considered in this light.

██ The term "Territory" has been read broadly. In *United States v. Standard Oil Company of California*, 404 U.S. 558, 92 S.Ct. 661, 30 L.Ed.2d 713 (1972), the Supreme Court concluded that the Sherman Act was applicable to American Samoa, an "unorganized" territory. In articulating the test to determine whether those islands were covered, the Court stated that the test was whether: " 'if the acquisition of that insular dependency had been foreseen, Congress would have so varied it comprehensive language as to exclude it from the operation of the act.' " *Id.* at 559, 92 S.Ct. at 662 (quoting *Puerto Rico v. Shell Co.*, 302 U.S. 253 at 257, 58 S.Ct. 167, 169, 82 L.Ed. 235 (1937)). In light of the far-reaching jurisdiction of the NLRB, we do not think Congress intended to exclude the Marianas from operation of the NLRA. *See NLRB v. Security National Life Insurance Co.*, 494 F.2d 336 (1st Cir.1974) (NLRA applicable to the "commonwealth" of Puerto Rico).[2] The Board's construction of the term "Territory" is "reasonably defensible," and it did not exceed its jurisdiction in finding the NLRA applicable.

██ However, even if we concluded that the NLRA did not apply of its own force, we would still conclude that the NLRB had jurisdiction because the 1976 Covenant makes the NLRA applicable to the Marianas. The formula for determining whether the NLRA is applicable to the Marianas is found in sections 502(a) and 504 of the 1976 Covenant.

Section 502(a) provides that certain federal laws will apply to the Northern Mariana Islands. Section 502(a) reads:

The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant:

(1) those laws which provide federal services and financial assistance programs and the federal banking laws as they apply to Guam; Section 228 of Title II and Title XVI of the Social Security Act as it applies to the several States; the Public Health Service Act as it applies to the Virgin Islands; and the Micronesian Claims Act as it applies to the Trust Territory of the Pacific Islands;

(2) *those laws not described in paragraph (1) which are applicable to Guam and which are of general application to the several States as they are applicable to the several States....*

90 Stat. 268 (emphasis added).

---

1. Unlike Puerto Rico, Guam, and the Virgin Islands, the Northern Mariana Islands are not enumerated among the territories to which the NLRA applies.

2. Moreover, as stated in Senate Report 94–596, "Although described as a commonwealth, the *relationship is territorial in nature* with final sovereignty invested in the United States and plenary legislative authority vested in the United States Congress. The essential difference between the Covenant and the usual territorial relationship, ... is the provision in the Covenant that the Marianas constitution and government structure will be a product of a Marianas constitutional convention, *as was the case with Puerto Rico...."* S.Rep. No. 596, 94th Cong., 2d Sess. 2 (1976), *reprinted in* 1976 U.S. Code Cong. & Ad. News 448, 449 (emphasis added).

Section 504 provides for the creation of a Commission on Federal Laws (Commission) to survey the laws of the United States and to make recommendations to Congress as to which laws of the United States should or should not be made applicable to the Marianas. This section requires that at least four of the seven members of the Commission be citizens of the TTPI and have been domiciled in the Northern Marianas for at least five years. The Commission was to make interim reports to Congress before termination of the Trustee Agreement, and issue a final report within one year of the termination of the Agreement.

Section 1003 of the 1976 Covenant makes sections 502 and 504 applicable as a result of its approval by the people of the Marianas, their legislature, Congress and the President. The language of the 1976 Covenant is clear and unambiguous. The laws applicable to Guam and the several states are also applicable to the Northern Marianas, and the NLRA is applicable to both Guam and the several states.

We cannot accept MTC's theory that it would be inconsistent with the purposes of the trusteeship agreement (self-government and economic self-sufficiency) to apply the NLRA to the Marianas. The 1976 Covenant was designed so the Commission could take into consideration those laws that might defeat the goals of the trustee agreement. If the Commission believed the NLRA was not in the best interest of the Marianas, it could have recommended that it not apply. However, up to this point, the Commission has expressly refused to recommend that the NLRA be made inapplicable to the Northern Mariana Islands.

Moreover, even if we adopt MTC's characterization of section 502 as an interim solution to deal with "the most pressing statutory problems; the 'squeaking wheels,' " so to speak, it is still the solution that a unanimous Mariana legislature, an overwhelming Mariana citizenry and the Congress of the United States has endorsed. Even if we disagree with the solution, absent statutory change, or a decision by the Commission, section 502 cannot be read to exclude the NLRA.

3. *The NLRB's discretion.* MTC argues that even if the NLRB had jurisdiction, it abused its discretion in asserting that jurisdiction. It argues that the Board abused its discretion because it failed to address its own precedents,[3] and because the question of the application of the Act to the islands was under consideration by the Commission.

"[T]he extent to which the Board chooses to exercise its statutory jurisdiction is a matter of administrative policy within the Board's discretion, and is not a question for the courts, in the absence of extraordinary circumstances, such as unjust discrimination." *NLRB v. Carroll-Naslund Disposal, Inc.*, 359 F.2d 779, 780 (9th Cir.1966) (citations omitted). MTC has not alleged unjust discrimination or other "extraordinary circumstances." Nor has it articulated some compelling reason that might justify a departure from this settled rule of law.

■ Moreover, in deciding whether to exercise jurisdiction, the Board considered a number of factors, including: (1) the Marianas are close to Guam geographically, culturally, and economically, (2) both are readily accessible by regularly scheduled airlines, (3) both are served by federal courts, (4) the Marianas have a significant working population in private industries traditionally within the Board's jurisdiction, and (5) there is widespread use of federal grants and programs in the Marianas.

**B. Union Certification.**

The petitioner argues that the NLRB should have had a hearing on MTC's objections that government officials interfered in the election proceedings and that voters were improperly given monetary inducements.

■ The NLRB has broad discretion to determine the propriety of the union representation election process, *NLRB v. Island Film Processing Co.*, 784 F.2d 1446, 1450

---

**3.** Petitioner cites *Hall-Brooke Hosp. v. NLRB,* 645 F.2d 158, 160 (2nd Cir.1981), and *NLRB v.* *Austin Devel. Center,* 606 F.2d 785, 790 (7th Cir.1979).

(9th Cir.1986); *see also NLRB v. Best Products Co.,* 765 F.2d 903, 906–07 (9th Cir.1985), and we will not overturn a Board decision to certify a union unless the Board has abused that discretion. *NLRB v. All-Weather Architectural Aluminum, Inc.,* 692 F.2d 76, 78 (9th Cir.1982); *NLRB v. Big Three Industries, Inc.,* 602 F.2d 898, 901 (9th Cir.1979).

1. *Governmental Interference.* MTC states that Ponciano C. Rasa, the President of the Northern Marianas Senate, and Herman Manglona, the Mayor of Tinian, actively campaigned on behalf of the Union. It argues that these government officials improperly interfered with the election, and that the Board should have held a hearing to determine whether improper governmental influence tainted the election.

MTC states that *Columbia Tanning Corp.,* 238 NLRB 899 (1978), holds that an "employees' exercise of free choice is impaired when one party misleads voters to believe that that party's position has official governmental imprimatur." MTC gives *Columbia Tanning* an overly broad reading.

In *Columbia Tanning* the Commissioner of Labor for the State of Massachusetts sent a letter to employees advocating union membership. The letter was written in Greek and printed on official stationary, and most of the employees were recent immigrants who in all likelihood were not familiar with the complexities of state and federal jurisdiction over labor relations. *Id.* at 900. The Board invalidated the election, concluding that "[t]he potential for confusion eliminated the Board's appearance of impartiality and thereby interferes with the exercise of a free choice in the election." *Id.* at 900.

The *Columbia Tanning* election was not invalidated by the Board merely because a state officer expressed support for the union, but because it could have easily appeared that the *Board* favored one side or the other. In this election, MTC did not claim that it appeared that the NLRB favored one side or the other, nor did it otherwise demonstrate that the alleged misconduct interfered with the employees' exercise of free choice.

■ The Board did not abuse its discretion in concluding that MTC did not make a prima facie showing that the actions of the local officials constituted interference with the election.

2. *Monetary inducements.* MTC also argues that improper monetary inducements were offered to three voting employees, and that the election should be invalidated for that reason, or in the alternative, the Board should have held a hearing on this matter prior to union certification.

A "hearing is unnecessary where if all the facts contended for by the objecting party [are] credited, no ground is shown which would warrant setting aside the election." *NLRB v. Aaron Brothers Corp.,* 563 F.2d 409, 411 (9th Cir.1977) (quoting *NLRB v. Smith Industries,* 403 F.2d 889, 892 (5th Cir.1968)).

The Board assumed the truth of the petitioner's allegations, and canceled one of the votes in favor of the union as a result.[4] However, the Board concluded that there were no other improper inducements, and invalidating one vote could not affect the outcome of the election.

MTC alleges that there were other "inducements" that required the election results to be invalidated.

■ Jose Reyes was visited at his home by Oscar Rasa and given an envelope containing a letter from Ponciano C. Rasa, the Marianas Senate President. Rasa stated that the envelope contained $50, but in fact, the envelope contained no money, only a letter from Ponciano C. Rasa. Reyes did not allege that he was told he would receive money if he voted for the union, but stated that "Oscar thought if he gave me $50 I would support the union." Reyes' statement about what was going through Rasa's mind is speculative, and Rasa's actions do not amount to an improper "inducement." The Board did not abuse its discretion in concluding that this was not an improper inducement.

■ On another occasion, a nonvoting supervisory employee was buying a half

---

**4.** The Board concluded that the offer to buy an airplane ticket was an improper inducement.

case of beer at a local store when he met Oscar Rasa. Rasa asked him to have his crew vote for the union, asked him to attend a breakfast with a union representative, and paid the cashier for the beer purchase. This incident involved an employee that was not eligible to vote, and this action does not rise to the level of an improper inducement.

The Board accepted MTC's allegations as true, and did not abuse its discretion in holding that MTC failed to establish a prima facie case that improper inducements had an impact on the outcome of the election.

## IV

## CONCLUSION

The NLRB did not err in exercising jurisdiction over the representation of employees in the Northern Mariana Islands. The NLRA as well as 1976 Covenant make the Act applicable to the Northern Marianas.

Nor did the NLRB abuse its discretion in certifying the Union without holding a hearing on the employer's objections. Assuming the truth of MTC's allegations, MTC did not make a prima facie showing that there was election misconduct that would affect the election.

ORDER ENFORCED.