PACIFIC MICRONESIA CORPORA-TION, d/b/a Dai–Ichi Hotel Saipan Beach, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Hotel Employees and Restaurant Employees Local Union No. 5, AFL–CIO, and Commonwealth Labor Federation, Intervenor.

No. 99–1078.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 14, 2000.

Decided June 27, 2000.

Ronald B. Natalie argued the cause for petitioner. With him on the briefs was Douglas W. Hall.

David A. Fleischer, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel. Margaret A. Gaines, Supervisory Attorney, entered an appearance.

Intervenor Hotel Employees and Restaurant Employees Local Union No. 5, AFL–CIO, joined in the brief filed by the National Labor Relations Board. David A. Rosenfeld and Victor J. Van Bourg entered appearances.

Before: SILBERMAN, WILLIAMS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The National Labor Relations Board held that Pacific Micronesia Corporation, d/b/a Dai–Ichi Hotel Saipan Beach, violated §§ 8(a)(1) & (5) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, by refusing to bargain with or provide information to the Commonwealth Labor Federation and the Hotel Employees & Restaurant Employees, Local 5, AFL–CIO (collectively, the Union). Dai–Ichi claims it need not deal with the Union because the Board improperly defined the bargaining unit for which it was certified and because the election of the Union as the employees' bargaining representative was invalid. We agree with Dai–Ichi that the representation election was invalid. Without resolving the unit determination issue, therefore we grant the Company's petition for review and deny the Board's cross-application for enforcement.

## I. Background

Dai–Ichi operates a resort hotel located on the island of Saipan in the Commonwealth of the Northern Mariana Islands (CNMI). The Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 48 U.S.C. § 1681 at 539 (West 1987), governs the relationship between the CNMI and the United States. Section 502(a)(2) of the Covenant makes certain federal laws, including the NLRA, effective in the CNMI, *see Micronesian Telecommunications Corp. v. NLRB,* 820 F.2d 1097, 1101 (9th Cir.1987), while § 503(a) of the Covenant provides that the "immigration and naturalization laws of the United States" generally do not apply in the CNMI. 48 U.S.C. § 1681. Acting under its reserved authority to regulate immigration, the CNMI enacted the Nonresident Workers Act (NWA) which "provide[s] strict[ ] enforcement, control and regulation of nonresident workers," NWA § 4411(b), by severely restricting the immigration of nonresidents and by limiting the "employment of nonresident workers ... to the duration of the specific job or employment for which the alien was recruited." NWA § 4411(a). Among the many restrictions the NWA places upon the employment of nonresidents, the following are most noteworthy.

An employer in the CNMI may hire a nonresident worker only if the Chief of Labor certifies that no resident is available to fill the position. *See* NWA § 4433. Upon such certification, the employer and the Chief must enter into a "nonresident employment agreement," which memorializes a description of the position, the time at which the employer must again seek to fill the position with a resident, the employment contract to be offered to the nonresident, and the employer's commitment to secure a bond or surety for the employee. *See id.* The actual employment contract in turn must specify the term and location of employment, work schedule, wage scale for regular and overtime hours, and any pay deductions required by law. *See* NWA § 4433(g).

The Chief of Labor may authorize a nonresident employee to work for no more than one year at a time, but the employer may annually apply to extend his employment for an additional year. *See* Alien Labor Rules and Regs. § II.D. A nonresident may not work for anyone other than the employer specified in the employment contract and neither the employer nor the nonresident may alter the terms of their employment contract without approval from the Chief. *See* NWA § 4437(d). Upon the completion of the term of employment or the end of the employment relationship, a nonresident must immediately depart from the CNMI unless he has filed a breach of contract claim against the employer, in which case he may remain in the CNMI for a short time. *See* NWA § 4434(g).

Approximately 77% of Dai–Ichi's employees are nonresidents, and Dai–Ichi's Personnel Manager testified before the Board that the company routinely seeks to extend the employment of any nonresident worker who has performed well. Indeed, a significant portion of Dai–Ichi's nonresident workforce has been in Dai–Ichi's employ for five or more years.

In November 1995 the Union petitioned for an election in a bargaining unit consisting of all Dai–Ichi's workers. Dai–Ichi objected to the election on various jurisdictional grounds; alternatively it contended that the nonresident employees "lack a community of interest with the resident employees," and therefore should be in a separate bargaining unit. The Regional Director overruled Dai–Ichi's jurisdictional objections, established a single bargaining unit comprised of both residents and nonresidents, and set the election for March 21, 1996. The Board rejected Dai–Ichi's request for review.

A little more than one week prior to the election the press in the CNMI began describing various legislative proposals relating to nonresident workers. (Although the record contains only newspaper articles, the Board found that similar reports aired on television at about the same time.) On March 13, the Marianas Variety News & Views (Variety) published a story entitled "Reyes to union: Leave us alone," which contains a statement by Rep. Pete Reyes, the majority leader in the CNMI House of Representatives, announcing his intention to introduce a bill limiting to two years the time a nonresident worker could lawfully remain in the CNMI. Reyes said he intended the bill to curtail "problems with overstaying alien workers," and to "send[ ] a message to union organizers that they cannot promise workers [an] indefinite stay in the [CNMI]." Three days later, the Pacific Daily News ran an article entitled "Torres opposes union," reporting that Rep. Stanley Torres had announced his intention to "introduce legislation … to limit aliens to two renewals of their employment contracts if they join labor unions." The article also mentions that the announcement came approximately one week prior to the election at the Dai–Ichi hotel.

In the ensuing days prior to the election, the news media circulated several more reports related to the legislative proposals of Reps. Reyes and Torres. Variety published a story on March 18 entitled "Reyes: Send home displaced workers,"

which reported that Rep. Reyes' proposal would prevent a nonresident worker who had been discharged from remaining in the CNMI pending the outcome of his grievance. Rep. Reyes is reported to have stated that he made the proposal partially in response to a "recent demonstration participated in by alien workers bearing placards calling Saipan 'the island of the abusers.'" That same day articles in Variety and in the Saipan Tribune quoted Rep. Torres as saying his proposal would "limit all nonresident workers who have joined a labor union to only two contract renewals." Variety quoted Rep. Torres as saying that the bill "is not about punishing those who will join the union [but rather] about putting union organizers on notice that they could not promise anything for these workers"; the paper also quoted Elwood Mott Jr., a union organizer, as saying that the bill would be inconsistent with "sections 7 and 8 of the National Labor Relations Act." The Tribune article, entitled "Joining a union: Hazardous to your health," mentioned that the Union was attempting to organize Dai–Ichi's workforce, noted that some U.S. government officials had accused the Union of having connections to organized crime, and ended by pointing out that Rep. Torres' bill "would allow non-union members to continue to renew their employment contracts indefinitely." Dai–Ichi attached this article to a flyer and circulated it to the employees.

In the final few days before the election, the news media reported that the bills as introduced would in fact apply to all non-residents, not just union members, but the stories continued to portray Reps. Reyes and Torres as very much opposed to unionization. The March 19 Tribune, in an article entitled "Torres: Union lying about dues," reported that Rep. Torres had accused the Union of collecting excessive dues from workers in Saipan and it quoted him as saying that "becoming a union member will be a lifetime employment record and may haunt you everywhere you go when looking for a new job." That same day Variety reported that the Saipan Chamber of Commerce strongly opposed Rep. Torres' bill and quoted the president of the Chamber as stating that the bill would "probably be unconstitutional" if applied only to nonresidents who join unions. On March 20, the Tribune reported that Rep. Torres had introduced a bill "propos[ing] that any 'nonresident' worker who has lived and worked in the CNMI for two or more consecutive years be required to leave the CNMI for at least 30 days before the worker may be allowed to ... continue working." The remainder of the report contrasts Rep. Torres' bill with an earlier law that had limited nonresidents to four years in the CNMI; employers had succeeded in having the four year limit repealed. Variety also published on March 20 a two-page advertisement paid for by Rep. Torres that contained clippings from newspaper articles and letters regarding the Union; several of the articles featured in the advertisement were among the ones described above.

On the day of the election Variety ran an article reporting the parties' predictions of victory, a statement by Dai–Ichi's counsel accusing the Union of charging excessive dues, responses by Union supporters claiming the Union would reduce dues if it won, and a statement by Rep. Torres that the Union has a history of striking and that strikes "would cause civil unrest in the CNMI." Variety also published an article entitled "2–year, 4–year limits for workers opposed" in which Diego Benavente, Speaker of the CNMI House of Representatives, stated that he intended to "lobby his colleagues in the House against any legislation seeking to impose a limit on the legal stay of non-resident workers in the CNMI." Speaker Benavente is quoted as stating that Rep. Torres' bill "is not only for union members but for all non-resident workers" and that federal law prevents the CNMI from "treat[ing] union members differently." Finally, the Tribune printed an article in which Dai–Ichi's counsel is quoted as saying the Union lied to employees when it told them it would

charge reduced dues and that Dai–Ichi planned to file unfair labor practice charges against the Union for deceptive advertising.

The election of March 21 resulted in a decisive defeat (157 to 91) for the Union. The Union filed objections to the election, including three objections claiming, as the Regional Director characterized them, that "third parties interfered with employee free choice ... by threatening the reinstatement of the four year limit on nonresident worker's [sic] contract renewals and/or threatening to limit non-resident worker's [sic] contracts to two years." Finding that the "remarks published in the barrage of newspaper articles" described above "constitute third party conduct so aggravated that they created a general atmosphere of fear, reprisal, and confusion rendering a free election impossible," the Regional Director recommended overturning the election results. The Board adopted the Regional Director's findings, rejected Dai–Ichi's objections, and directed that a second election be held.

The second election was held on February 5, 1998. This time the Union prevailed (131 to 121) and Dai–Ichi filed objections to the election, including its claim that the Board erred by overturning the results of the first election. The Regional Director rejected Dai–Ichi's objections and certified the Union as the representative of the bargaining unit; the Board rejected Dai–Ichi's request for review.

In order to obtain judicial review, Dai–Ichi refused to provide information to or to bargain with the Union. Upon the Union's filing an unfair labor practice charge, the General Counsel issued a complaint claiming Dai–Ichi had violated §§ 8(a)(1) & (5) of the NLRA. Finding no issues of disputed fact, the Board granted summary judgment in favor of the General Counsel and directed Dai–Ichi to bargain with the Union. Dai–Ichi petitioned this court for review of the Board's order, the Board cross-applied for enforcement, and the Union intervened in support of the Board.

## II. Analysis

■■■ Dai–Ichi argues that the Board erred by overturning the first election and by including within a single bargaining unit both resident and nonresident employees. We must uphold the Board's decisions unless "upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Micro Pacific Development Inc. v. NLRB*, 178 F.3d 1325, 1328–29 (D.C.Cir.1999). To meet the requirement of "[s]ubstantial evidence," the Board must produce "more than a mere scintilla" of evidence; it must present on the record "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938), taking into consideration the "record in its entirety ... including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Our review for substantial evidence also must ensure that the Board has "draw[n] all those inferences that the evidence fairly demands." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378–79, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998).

We think there is serious reason to doubt the propriety of the bargaining unit in this case because of the inherent conflict of interest between resident and nonresident employees, but the matter is far from clear. *See Saipan Hotel Corp. v. NLRB*, 114 F.3d 994, 998 (9th Cir.1997). We need not decide that issue, however, because we agree with Dai–Ichi that the Board erred by overturning the results of the first election.

■■■ The Board's precedents establish that it rarely overturns the results of a representation election because of misconduct not attributable to a party to the

election, and then only if that "misconduct was so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." Westwood Horizons Hotel, 270 NLRB 802, 803 (1984). In this case the Board found the statements made by various members of the CNMI House of Representatives, as reported by the news media, constituted "third party threats" that made it impossible for the employees freely to decide whether to vote for the Union. We question seriously the idea that statements made by lawmakers concerning legislative proposals designed to address political issues could ever be grounds for overturning a representation election. *Cf. NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617–18, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (stating employer's comments about representation election must be more limited than those regarding "the enactment of legislation ... where the independent voter may be freer to listen more objectively and employers as a class freer to talk"). Nevertheless, we need not and do not decide that question here because the Board's determination that the reports "created an atmosphere of confusion, and fear of reprisals so as to render impossible the rational, uncoerced selection of a bargaining representative" is not supported by substantial evidence. Indeed, there are two major deficiencies with the evidence the Board relies upon to support its determination: Most of the news reports could not have affected in any way the employees' ability to decide freely whether to select the Union as their bargaining representative, and to the extent any of the reports conceivably could have affected the employees' ability to choose freely, the reports are too insignificant to have caused such fear and confusion that free choice was impossible.

The Board overturned the results of the first election because it determined that the reports in the media made it impossible for the employees to vote freely. In order to support this determination, therefore, the Board needed at a minimum to present evidence of events from which "it reasonably appears that the freedom of choice of the employees could have been interfered with." James Lees & Sons Co., 130 NLRB 290, 291 n. 1 (1961). Although the type of evidence required in this case seems self-evident, *see, e.g.,* Westwood Horizons Hotel, 270 NLRB at 803 (threats of physical violence if employees voted against Union); James Lees & Sons Co., 130 NLRB at 291 ("[N]umerous statements and conduct by various responsible groups and individuals in the community ... reasonably conveyed the view to the employees that in the event of unionization the Employer would shut down its plant and other employers would not locate in the community"), the Board repeatedly attempts to justify its decision to overturn the first election by relying upon evidence that simply is not relevant to the employees' free choice.

For example, the Regional Director observed that passage of the bills limiting the amount of time nonresidents could remain in the CNMI would have meant immediate job loss and deportation for a significant number of Dai–Ichi's long-term employees. Noting that threats of deportation and job loss are quite serious, he then opined that many of Dai–Ichi's workers might have "reasonably conclud[ed] that it was better to stay and work without union representation, than to be sent back to their homeland[s]." The gap in this reasoning is obvious: Passage of the proposed legislation was not in any way contingent upon the outcome of the election. Therefore, the pendency of the legislative issue (and the reports thereon) had no bearing upon the employees' ability to choose freely in the election. Although it is quite possible that news of the legislative proposals caused fear and confusion among Dai–Ichi's employees—perhaps causing some of them to worry that they would not be able to remain in the CNMI—they simply had no reason to fear the consequences of voting for the Union. Yet the Board overturned the first election on the ground that

the employees' fear and confusion "render[ed] impossible" a "free expression of choice." Westwood Horizons Hotel, 270 NLRB at 803. From the evidence in the record, that is a non sequitur.

In this court the Board highlights four aspects of the record in support of its conclusion. First, the Board points out that some early reports had erroneously described the bills as limiting the number of times nonresidents who joined a union could renew their employment contracts while leaving unaffected the renewals of nonresidents who did not join a union. Second, the Board notes that several articles about the proposed legislation refer to the impending election at Dai–Ichi. Third, the Board points out that some of the reports contain statements indicating that the proposals were intended to deter the Union. Finally, the Board relies upon one of the articles that quotes Rep. Torres as stating that joining a union "may haunt you everywhere you go when looking for a new job." We consider these four points both seriatim and cumulatively, but are nonetheless constrained to conclude they do not, even in the aggregate, constitute substantial evidence supporting the Board's determination that the employees were unable to vote freely in the first election.

First, although some of the early reports did refer to (nonexistent) legislative proposals that would have adversely affected only nonresidents who were union members, later reports repeatedly corrected those early mis-descriptions. The last article to err in that regard appeared on March 18; all subsequent articles either expressed opposition to such a proposal or stated that the actual proposals would apply to all nonresident workers, union and non-union alike. A report on March 19 stated that the Chamber of Commerce believed a bill targeting union members would be unconstitutional and that it would strongly oppose a bill limiting the number of times any nonresident's contract could be renewed. Then, on March 20, the Tribune reported that the bills actually introduced applied to all nonresidents regardless whether they were members of a union, and Variety published an article on March 21 reiterating that the bills applied to all nonresidents. The later reports clearly dispelled any notion that the proposed legislation affected only those nonresidents who joined a union. The Board's emphasis solely upon the earlier articles, therefore, is misplaced.

Second, mention of the election at Dai–Ichi in some articles lends no support to the Board's determination. To begin, only three of the articles even mention the then-impending first election in relation to the proposed legislation. The rest of the articles either do not mention the election at all or mention it in a way that does not relate to the proposed legislation. For example, an article appearing in the Tribune on March 19 begins by mentioning that "[w]ith an election set this week at the Dai–Ichi Hotel ... Rep. Stanley T. Torres has renewed his criticism" of the Union, but that article does not mention any of the legislative proposals. Even assuming, however, that some of the articles did lead employees to believe that the legislation was introduced because of the Union's efforts to organize Dai–Ichi's workforce, those articles cannot reasonably be seen as constraining the employees' ability to vote freely in the election. Not one of the articles ever intimates that the results of the election could affect the legislative outlook in any way. Although it may have been reasonable for an employee to speculate that the Union's efforts to organize Dai–Ichi's workforce at least partially precipitated the proposals, it would not have been reasonable for an employee to conclude that the results of the election could do anything to defeat or otherwise derail the proposals, which dealt with larger issues of immigration and employment policy.

Nor does the Board's third point, that some news reports indicated the legislative proposals were designed to deter the Un-

ion's organizers, suggest that the employees were unable to vote freely in the first election. Only by quoting fragments of the articles out of context can the Board argue otherwise. For example, the Board argues that several of the articles "quoted the legislators as saying they wanted to 'send a message to union organizers,'" implying that the proposals were designed to deter unionization. Read in context, however, the reports are much less ominous. In fact, the articles containing the phrase "send a message" state in substance that Reps. Torres and Reyes "wanted to send a political message to union organizers 'that they could not promise alien workers permanent residency in the island.'"

Some of the articles cited by the Board do indicate that some legislators were adverse to unionization in general and to the Union in particular but those articles simply do not support the Board's conclusion that the employees were unable to vote freely. The Supreme Court has held that in an election contest even the employer, who has some direct control over his employees' economic well-being, "is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit'" for voting respectively against or for unionization. *Gissel Packing Co.*, 395 U.S. at 618, 89 S.Ct. 1918. Overturning an election based upon statements made by legislators requires more reason to believe that employees' freedom of choice was compromised: The Board will overturn an election if conduct attributable to the parties "created such an environment of tension and coercion as to have had a probable effect upon the employees' actions at the polls," but will overturn an election based upon third party conduct only if the misconduct is "so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." *Overnite Transp. Co. v. NLRB,* 140 F.3d 259, 264–65 (D.C.Cir.1998). Applying this standard, the statements made in the present

case by various legislators opposed to unionization in general and accusing the Union in particular of corruption cannot possibly be a ground for overturning the first election. If the rule were otherwise, the electoral process would be subject to endless manipulation by politicians and their allies in labor or management.

With respect to the Board's last point, the statement attributed to Rep. Torres appeared in an article in which he accused the Union of charging excessive dues and of engaging in "sneaky" and potentially illegal campaigning. The article ends with the following passage: "In closing his statement, Torres said that although workers have a right to choose whether or not to join a union, 'becoming a union member will be a lifetime employment record and may haunt you everywhere you go when looking for a new job.'" This statement, like the statements just discussed, is nothing more than Rep. Torres' expression of general dislike of unions and cannot be a ground for overturning an election. Therefore, this portion of the record also fails to provide meaningful evidence for the Board's finding that the employees were unable to vote freely in the first election.

Considering the Board's evidence as a whole, we think it falls well short of being substantial. None of the individual points is probative, and taken as a whole they do not add up to any more than the sum of the parts. We are therefore constrained to conclude that the Board has failed to support with substantial evidence its decision to overturn the first election.

### III. Conclusion

The Board's finding that news reports "created an atmosphere of confusion, and fear of reprisals so as to render impossible the rational, uncoerced selection of a bargaining representative" in the first election is not supported by substantial evidence. Consequently, we grant Dai–Ichi's petition

for review and deny the Board's cross-application for enforcement.

*It is so ordered.*