# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 5, 2018　　　　　Decided March 6, 2018

No. 16-1427

EQUINOX HOLDINGS, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 87,
INTERVENOR

———

Consolidated with 17-1013

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Kenneth F. Sparks* argued the cause for petitioner. With him on the briefs was *Mark L. Stolzenburg*.

*David Casserly*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*,

Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Elizabeth A. Heaney*, Supervisory Attorney.

*Hunter Pyle* argued the cause and filed the brief for intervenor.

Before: WILKINS, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge:* Petitioner seeks review of a National Labor Relations Board determination that it violated Sections 8(a)(5) and (1) of the National Labor Relations Act by refusing to bargain with Service Employees International Union Local 87. Its defense is that the Board unreasonably discounted two threats that tainted the election, which the union won. The company claims union adherents told employees they risked deportation if they voted against the union and the union used an observer at one voting location who had recently been discharged for possession of a gun. We conclude, given our limited scope of review of Board representation determinations, that we cannot challenge the Board's resolution of either issue.

## I.

The union filed an election petition in May 2015 covering employees working at three gyms in San Francisco. The election was held, by consent, shortly thereafter. The union won 41 to 33. Equinox objected, which led to a hearing conducted, under the auspices of the Regional Director, by a Hearing Officer.

Although the company produced testimony that one of the employees had threatened to call ICE if the union lost, the Hearing Officer declined to credit the testimony. Indeed, there was no credited evidence presented that anyone representing the union had made an ICE-related threat. The Hearing Officer concluded that, at most, there were rumors amongst the employees concerning the possibility of ICE's involvement.

The employer's second objection is based on a gun incident. Four days prior to the election, a Regional Maintenance Manager in the Market Street gym was informed by an employee that one Jared Quarles had brought a gun to work. He checked Quarles' bag, and upon finding what he believed to be a gun, reported to the manager. Equinox's Regional Vice President for the West Coast, Jack Gannon, was present at the facility. On advice from Equinox's general counsel, Gannon verified the presence of the gun and then called 9-1-1 to alert the authorities.

When the police arrived, they restrained Quarles with handcuffs and led him through the facility, passing other employees who worked there. Quarles responded by yelling profanities about Equinox. Upon closer inspection, the police realized that the weapon they discovered was a replica airsoft gun that merely resembled a firearm; the orange-colored tip required by federal and California law had been removed.[1] They

---

[1] *See* 15 U.S.C. § 5001(b)(1); CAL. PENAL CODE § 16700 (b)(4)(A) (West 2017); *id.* § 20165 (West 2012). An "airsoft" gun is a toy weapon that uses air to propel plastic pellets at a nonlethal velocity. These weapons can nevertheless inflict pain and injury, and often closely resemble *bona fide* firearms – as, we note, did the gun possessed by Quarles.

4

then released Quarles from handcuffs and escorted him out of the building. Several employees who had not witnessed this incident later testified that they had heard about it from their peers. Quarles was subsequently terminated.

Three days after the arrest, and the day before the election, the union hired Quarles. He was paid to work in a phone bank, making calls on behalf of the union in the final days of the campaign. The union also chose him to serve as its election observer at the Pine Street gym. Each voter was required to self-identify to him before receiving a ballot.

Beyond these agreed-upon facts, the parties dispute the details of the gun incident. In its initial objections, Equinox claimed that Quarles had shown the firearm to other employees, threatening that he carried it for anyone who "f---ed with him." A manager at the Market Street gym testified that an employee had complained to him that Quarles "carries [the gun] sometimes in his pants. He's always waving it around." The manager testified that the same employee later mentioned a different occasion in which Quarles brandished the gun in the lunch room, declaring that he carried it "in case any f---ers want to get crazy."

When this employee was asked to give a written statement, however, he refused. Gannon testified that the employee did so "out of fear and actually threatened to quit his job." And the employee's manager testified that the employee explained, when declining to cooperate, that "I have kids. These people know where I live. . . . I don't want to . . . deal with the Union at all." Although Equinox subpoenaed the employee to testify before the Hearing Officer, the employee refused to enter the room – even once it had been cleared. The Hearing Officer, however, declined to enforce the subpoena and force the witness to testify.

Thus, there exists no direct testimony or evidence establishing that the alleged brandishing and threats took place.

The Hearing Officer found that the evidence of the gun incident was insufficient to warrant overturning the election. He stated that the manager's testimony about the employee's account of the lunch-room encounter constituted "uncorroborated hearsay," which he found especially troubling because two other witnesses to the alleged brandishing were not even called by Equinox to testify.[2] He emphasized the lack of any evidence establishing Quarles as an agent of the union at the time of the incident or tying his possession of the gun to the union's organizing campaign. Given this lack of a connection, the Hearing Officer found that "the harm caused by the delay in seeking enforcement [of the subpoena] would override the benefit, if any, of seeking to compel the witness to testify."

The Regional Director affirmed the recommendations of the Hearing Officer in full. He found that the Hearing Officer had reasonably discredited certain testimony with respect to the immigration-related objection, and that as a result there was not sufficient evidence to support the allegations made by Equinox. The Regional Director also agreed with the Hearing Officer that because the gun incident "cannot reasonably be linked to the election" on the evidence proffered, the decision not to delay the

---

[2] We note parenthetically that while the unnamed employee's account of Quarles' actions was offered to prove the truth of the matter asserted and thus constitutes hearsay, other parts of his account consisted of facts that Gannon and the Regional Maintenance Manager observed directly. These include, for example, the employee's stated fear of the union and his report to his superiors that he felt "intimidated" by Quarles.

proceedings in order to enforce the subpoena was harmless at worst. Therefore, he determined that the union did not compromise the election by using Quarles as its observer under the circumstances. The Regional Director certified the union's victory.

The Board denied Equinox's request for review of the Regional Director's determinations. While one dissenting Member believed that the use of Quarles as an observer so soon after his workplace arrest and the alleged brandishing incident was sufficiently egregious to set aside the election, the majority disagreed. It found the Hearing Officer's adverse inference against Equinox for failing to call any other witnesses to be reasonable, and emphasized that "there is no evidence linking [Quarles'] possession of the airsoft gun to the Union or the organizing campaign." *Equinox Holdings, Inc.*, 364 N.L.R.B. No. 103 (2016). The union subsequently demanded bargaining; Equinox declined in order to test the certification. As noted, the Board held that this refusal violated Sections 8(a)(5) and (1) of the National Labor Relations Act,[3] and ordered Equinox to bargain with the union. This petition followed.

## II.

The company reiterates the three objections that it raised to the Hearing Officer, the Regional Director, and the Board. We think the Petitioner's claim regarding the prospect of ICE's involvement is rather weak. Although the Board has been

---

[3] 29 U.S.C. §§ 158(a)(1), (5).

sensitive to threats of deportation in an election campaign,[4] there was really no evidence presented to the Hearing Officer that the union was responsible for any threats that could potentially coerce employees to vote for the union. Although even a third party's threats could taint an election, *see Pac. Micronesia Corp. v. NLRB*, 219 F.3d 661, 665-66 (D.C. Cir. 2000), the Hearing Officer's determination of the lack of credibility of the employer's witness, who claimed union adherents raised the prospect of reporting to ICE if the union lost, is really not subject to challenge.

However, the union's use of Quarles as an observer at one location is more troublesome. Indeed, it caused one member of the Board to dissent. The Board argued before us that Quarles' behavior, which led to his discharge, was, as a matter of Board law, irrelevant to his status as an observer. *See* Resp't's Br. 20-21. We think that position is untenable. If Quarles had explicitly stated, "I will use the gun on anyone who opposes the union," and then was hired by the union as an observer, we can't imagine that the Board would regard that as irrelevant.

But whether or not Quarles brandished the gun – which the parties dispute – and regardless of exactly what he said, no one asserts that he connected his possession of the gun with the election or the union campaign. In the absence of such evidence, the Board's determination that the union's use of Quarles as an observer was not objectionable is within the scope of its discretion. As we have often said, our review of Board representation proceedings (called "R" cases by the cognoscenti)

---

[4] *See, e.g.*, *Q.B. Rebuilders*, 312 NLRB 1141 (1993); *Local 300, Cosmetic & Novelties Workers' Union*, 257 NLRB 1335 (1981); *Westside Hosp.*, 218 NLRB 96 (1975).

is extremely deferential. *See Amalgamated Clothing & Textile Workers v. NLRB*, 736 F.2d 1559, 1564 (D.C. Cir. 1984). And because no connection exists between Quarles' conduct and the election, we (like the Board) need not reach the question whether to analyze that conduct under the agent or third-party standard.[5]

That leads us to Petitioner's third argument that the Hearing Officer unreasonably refused to enforce the company's subpoena of an employee witness who could testify as to exactly what Quarles had said. Equinox contends that this decision violated the arbitrary and capricious standard, and prevented it from proving its case. The Hearing Officer expressed some doubt as to whether the Regional Director could enforce the subpoena, but as the Board's counsel acknowledges before us, its guidance to hearing officers allows for enforcement. Resp't's Br. 35 n.15. Still, the flaw in Petitioner's argument that the

---

[5] When considering whether the results of an election should be overturned because of misconduct, the legal standard applied to the conduct of a third party is more stringent than that applied to the conduct of an agent of a union. If it is alleged that a union agent has committed misconduct, the Board will overturn the election if it determines that that conduct has "the tendency to interfere with employees' freedom of choice." *Cambridge Tool & Mfg. Co., Inc.*, 316 NLRB 716, 716 (1995). However, when the alleged misconduct is committed by a third party who is not an agent of the union, the Board's test is "whether the misconduct was so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." *Westwood Horizons Hotel*, 270 NLRB 802, 803 (1984). Here, we have no need to decide whether the union's decision to hire Quarles so soon after his misconduct confers a sort of "backdated" agency upon him during the gun incident – thus requiring the agency standard.

Hearing Officer unreasonably declined to delay the proceeding while a subpoena enforcement proceeding ensued is that the employer never asserted that the employee, if called, would testify that Quarles had linked the gun to the union campaign or the election. In other words, the company never made a proffer of testimony that might have been crucial.[6]

\* \* \*

We note that the Board has sought what it has described as laboratory conditions for representation elections, but pursues that ideal in a difficult world. *Amalgamated Clothing & Textile Workers*, 736 F.2d at 1562. Given the lack of any evidence connecting the gun incident to the election or to the union itself, we hold that the Board did not abuse its substantial discretion in certifying the election results. And since none of Equinox's additional objections is substantial enough to trigger our "extremely limited" scope of review, *id.* at 1564, we deny Equinox's Petition and grant the Board's Cross-Application for Enforcement.

*So ordered.*

---

[6] We do think it rather unfair for the Hearing Officer and Regional Director, after declining to enforce the subpoena, to draw an adverse inference against the employer because it didn't produce any testimony concerning Quarles' statements. While it is true that two other witnesses existed, it is also true that it is notoriously difficult to persuade employees to testify against a union in settings like these. We think a simple finding of insufficient evidence would have been more appropriate than an adverse inference.